### 6927.  NICHOLS *v.* THE STATE.

1. Where a solicitor-general, in his private capacity as attorney at law, is counsel for the plaintiff in a suit for damages against a railroad company, and his fee is contingent or conditional, that is, dependent upon his client's recovery of damages from the defendant, he is disqualified

38

by interest from advising with the grand jury as to the finding of a true bill for perjury against a witness for alleged false testimony given by the witness in favor of the railroad company in that damage suit, where that cause, at the time of the finding of the indictment, is still pending in the courts.

(a) In such a case the court should appoint a solicitor-general pro tem. to go before the grand jury and advise with them about finding the indictment for perjury.

(b) Where the court does not appoint a solicitor-general pro tem., and where the disqualified solicitor-general appears before the grand jury and advises with them as to the finding of the indictment for perjury, and where the indictment is returned by them, a written plea in abatement, setting forth the above-stated facts, presented by the accused be fore pleading to the merits, and where the defendant had no notice of the pendency of the indictment against him, and no earlier opportunity of presenting his objections to it, is not subject to general demurrer, and should be sustained, unless issue is joined upon it; and in the latter event, if the issue is determined in favor of the defendant and is supported by proof, the plea in abatement should be sustained and the indictment quashed.

2. The court erred in sustaining the demurrer to the plea in abatement, and in striking the plea.

                              DECIDED FEBRUARY 4, 1916.

Indictment for perjury; from Gordon superior court—Judge Fite. August 30, 1915.

*Starr & Paschall, Neel & Neel, Maddox, McCamy & Shumate,* for plaintiff in error.

*Joseph M. Lang, solicitor-general,* contra.

BROYLES, J. An indictment for perjury was returned against A. J. Nichols, and it was alleged therein that the perjured testimony of Nichols was given by him when he testified as a witness for the defendant company in a case pending in the superior court of Gordon county, Georgia, wherein H. L. Knight was plaintiff and the Western & Atlantic Railroad Company was defendant. Before formally pleading to the indictment the defendant interposed a special plea in abatement, praying that the indictment be quashed, for reasons set forth therein. The State demurred to this plea and moved that it be stricken; the court sustained the demurrer and struck the plea, and the defendant excepted pendente lite. So much of the plea in abatement as is necessary for the determination of this case is as follows:

"The cause of H. L. Knight as plaintiff and the Western & Atlantic Railroad Company as defendant, wherein it is alleged in said indictment was delivered the alleged false and perjured tes-

timony of this defendant set forth in said indictment, was a suit pending in the superior court of Gordon county, Georgia, wherein said H. L. Knight, by his petition therein, claimed that he had received severe injuries to his person by reason of the negligence of the said railroad company and its agents or servants, to his damage in the large sum of $20,000. One of the attorneys at law for the plaintiff, H. L. Knight, in said cause, was and still is J. M. Lang, who was and is the same person as Joe M. Lang, the solicitor-general of the State of Georgia for the Cherokee judicial circuit, including said county of Gordon. This defendant says that the said J. M. Lang was and is, as attorney at law, representing the said H. L. Knight in said cause, for and in expectation of what is known as a contingent fee,—that is to say a fee dependent either directly or in a large part upon the event of said H. L. Knight obtaining a verdict in his favor in his said cause against the Western & Atlantic Railroad Company, and upon the amount of said verdict if obtained in favor of said Knight; and the said Lang was and is the sole counsel for said Knight in said cause resident in the said county of Gordon. This defendant says that in and about the making and preparation of the indictment against him in the cause first stated the said J. M. Lang, as such solicitor-general, and acting as such, was the official counselor of the grand jury of said county of Gordon, by whom said indictment was made, and was personally concerned and interested in the case made by said indictment against this defendant, because of his above-stated interest as attorney at law in the result of said cause of H. L. Knight against the said W. & A. Railroad, which cause is still pending and undetermined; and said J. M. Lang, or Joe M. Lang, appeared before said grand jury and gave advice to said body or the members thereof in and about the making of said indictment against this defendant.

"And this defendant further says: As illustrating and showing to the court the nature, character, and extent of the interest of said Lang in the said cause of H. L. Knight against the W. & A. Railroad Company, and the means said Lang wished to use and sought to use to procure a settlement thereof, and the relation between the same and the indictment made against this defendant in the instant cause, this defendant says that on or about the first day of December, 1913, the said Lang wrote and mailed

a letter to John L. Edmondson, claim agent of the Western & Atlantic Railroad Company, of which the following is a true copy.

"'Law office of J. M. Lang, Calhoun, Georgia.

"'December 1, 1913. Mr. John L. Edmondson, Equitable Building, Atlanta, Ga. Dear Sir: In re Knight vs. W. & A. R. R. Co. My understanding has been that there was pending some negotiations in an effort to settle this case. I am writing you in regard to the same and ask that you please advise me whether the company is going to settle this case, and, if so, about when. I have been over on the Sand Mountain and spent some time in an effort to ascertain the facts in regard to testimony of certain witnesses in this case. I have got considerable evidence which I believe is sufficient to convince any unbiased person that the testimony of the witnesses for the defendant who came from Alabama was and is untrue. In fact, I have secured a sufficient amount of evidence, in my opinion corroborating the sworn testimony of Mason, that you offered Hughes $250 conditionally, to at least make some interesting reading. This evidence, of course, might be used in the case in the Supreme Court, or it might be used in a proceeding to attach you for contempt. In other words, I have not fully decided yet just how would be the best way to use this evidence, and I am writing to ascertain whether the case will likely be settled or not, and, of course, if it is settled right away, I do not care to use it at all. This, of course, is a straight business proposition, and I am trying to collect the money that the jury says is due my client by your company. I know he needs this money very much and the jury said he was entitled to it, and I think the company ought to pay it. At least I am doing all I can to convince you that it will be to the best interest of the company to pay it right away. This matter was undertaken solely by me, and my associates at Rome had nothing to do with it. In fact they are both likely to get into politics, and I assure you that everything referred to in this letter is chargeable to me and not to either of them. If you see fit to reply to this, and if we can get this matter settled, I will be very glad indeed.

"'Yours very truly, [signed] J. M. Lang.'

"As further illustrating the feeling, interest, purpose, and intent of said Joe M. Lang, in the institution of this prosecution,

this defendant shows that a few months after the trial of the case of H. L. Knight vs. Western & Atlantic Railroad Company, in Gordon superior court, which trial occurred at the August term, 1913, thereof, the said Joe M. Lang came to the State of Alabama, where this defendant resided, and obtained an interview with Bob Hughes, as this defendant is informed and believes, and sought to persuade him to give an affidavit stating that the testimony which he had given on the trial of said Knight case was false, and defendant avers, on information and belief, that Bob Hughes refused to make such an affidavit; that he further stated to said Hughes that he desired certain affidavits to help in making the Western & Atlantic Railroad Company pay the verdict which had been rendered in said Knight case, and that it would help him to collect the money for said Knight. This defendant further states, upon information and belief, that said Lang, during said visit to Alabama, approached J. W. Murphy, a brother-in-law of said Hughes, and sought to procure him to see said Hughes and get him to make an affidavit stating that J. L. Edmondson had paid him to deliver false testimony in the above-stated case of H. L. Knight vs. Western & Atlantic Railroad, and stated to said Murphy that he did not wish to hurt anyone with the affidavit, but that if he could get it he would write said Edmondson telling him that he had the affidavit, and that said Edmondson would then pay the verdict in said Knight case, and that if said Edmondson did not pay said verdict, that he, said Lang, would have said Edmondson prosecuted, and further stating that the solicitor-general was named Maddox, and that he was a railroad lawyer, and might not want to prosecute Mr. Edmondson, but that if said Maddox would not prosecute said Edmondson, that he, Lang, would have some one appointed who would do so.

"This defendant further shows that some time during the month of February, 1915, before the fourth Monday in said month, said Lang again came to the State of Alabama, on Sand Mountain, where this defendant lived, and had with him a man by the name of Harry Wise, and also said Lang's client, H. L. Knight, all of whom came to this defendant's home while defendant was sick, and procured from this defendant an affidavit that what he had sworn to on the trial of H. L. Knight against the

W. & A. Railroad was untrue. As an inducement to this defendant to make said affidavit, said Lang told him that he would not be prosecuted criminally, and that there was no intention to give him any trouble therefor, but that they desired the affidavit merely to force the railroad company to pay Knight the amount of his verdict. As before stated, this defendant was sick, and had a sick child, and was so badly worried because of his sickness that he did not realize what he was doing or the effect thereof.

"During the latter part of the first week of the February term, 1915, of Gordon superior court, this defendant was arrested in Alabama, and handcuffed, and brought to Calhoun, Ga. Deputy sheriff O. Calbeck, of Gordon county, took charge of this defendant at Scottsboro, Alabama, and brought him, together with Bob Hughes, to jail in Calhoun, and there incarcerated him. This defendant was placed in a cell on an upper floor of the building and confined separate and apart from Bob Hughes, who was placed in a cell on the lower floor. As defendant and said Hughes were being carried from the station at Calhoun to the jail, they and the sheriff stopped at the court-house, where solicitor-general Lang instructed the sheriff not to allow this defendant or Hughes to make any bond, although Mr. O. N. Starr, an attorney at law, was then and there proposing and offering to procure a bond for them; and, at this direction of the solicitor-general, the sheriff did refuse to allow either of them to give bond. On Saturday morning after defendant was put in jail, said Lang came to the jail to see this defendant, and inquired if he intended to stick up to his affidavit given in Alabama; at the same time saying that he was now solicitor-general and had power to put this defendant in jail, and had power to let him out, and that the best thing for this defendant to do was to stick to the said affidavit, and that if he would do so, he, Lang, would take care of him, and see that he was let out without being harmed. And, induced by these promises, this defendant told Lang he would stand by the said affidavit, he believing that this was the best and easiest way to get out of jail. Said Lang then asked this defendant to go and see Hughes and get him to turn State's evidence and to join this defendant in testifying that he had sworn falsely in the Knight case, and to promise the said

Hughes that he, Lang, would take care of him in the same way he was going to take care of this defendant; and upon this inducement this defendant did go and talk to Hughes and tell him what Lang had said, and try to get the said Hughes to turn State's evidence. This defendant stayed with said Hughes in his cell all of that night, trying to get him to turn State's evidence as the said Lang desired, but could not get Hughes to do so. The next day this defendant left the cell in which said Hughes was confined, the same being cold and uncomfortable, and returned to his cell upstairs, which was warm. On the following Sunday Mr. Lang came to my cell. I asked him if Hughes had agreed to turn over, but I do not remember that he answered my question, or, if so, what he said. I then proposed to go down and talk to Hughes again. He said for me to go on and talk to him. I did then see Hughes and asked him what he decided to do. He said he guessed he would turn State's evidence, as Mr. Lang had told him that he would see him out. Lang was standing near by when Hughes told me this, and I then stepped out of the cell and Mr. Lang stepped to the door, and, I think, went in. I did not stay and hear the conversation between Hughes and Lang at that time. But Mr. Hughes and I pretty soon went upstairs together, and remained up there.

"On information and belief defendant avers that on the same Sunday afternoon Mr. Harry Wise came to the jail to see the defendant Hughes, and advised him that it would be best for him to turn State's evidence against Edmondson, and plead guilty to perjury, and that he further stated that this was the only way for said Hughes to get out, and that Lang had promised him, said Wise, that if Hughes would do this, that Mr. Lang would see him out of it; that after much persuasion said Hughes finally agreed to the suggestions of said Wise, and that he would turn State's evidence as hereinbefore stated. Defendant further states, that on information and belief, that said Wise further told said Hughes that when said Lang should come in he would ask Hughes if he had decided what he was going to do, and told said Hughes to reply that he had decided to make a clean breast of it; that said Wise then stated that said Lang would tell Hughes that he did not want him to put up any job on Edmondson, but wanted him to tell the truth; that said Wise then told Hughes

to tell Lang in the presence of the sheriff that he was telling him the truth; that shortly thereafter said Lang did come to the cell of said Hughes and ask him the questions that said Wise had stated he would ask, and that said Hughes made the reply which Wise had told him to make; that said Wise further told said Hughes before Lang came in that he would be carried before the grand jury and would be asked if any promises had been made to him to protect him in case he turned State's evidence against Edmondson, and that Hughes was to answer that none had been made. This defendant further states that pursuant to his promise to said Lang, previously made under the fears and hopes hereinbefore recited, he went before the grand jury and testified against said Edmondson as he had promised said Lang he would do. On information and belief defendant avers that said Hughes was also carried before the grand jury on the same day that defendant was carried before it, and testified against said Edmondson as he had promised said Lang to do, and was asked by said Lang the question which said Wise had told him would be asked, and answered the same as said Wise had instructed him to do. After this Mr. Hughes became sick with cold and had pneumonia fever in jail, and I stayed in his cell to wait on him. During that week we talked about what we had done, and both of us decided that we had done wrong; that Mr. Edmondson was innocent of the things we had sworn; and on the following Monday Mr. John L. Tye and J. M. Neel came to see us in the jail with the sheriff, who was present during the conversation which then occurred. Mr. Tye first asked Hughes to state what the truth was in regard to the matter, and Hughes stated that what he had testified on the trial of the Knight case was the truth, and that what he had sworn against Mr. Edmondson before the grand jury was not true, and gave a statement in some detail in regard to the manner in which he had been induced to so testify before the grand jury, and further that he desired to undo the wrong as far as he could, and that he desired Sam P. Maddox, O. N. Starr, and J. M. Neel to represent him as his attorneys. Said Tye, in the presence of the sheriff, also then and there talked to this defendant, and this defendant told him that what he had testified in the Knight case was true, and what he had testified before the grand jury against Mr. Edmondson was not the truth, and also

desired the attorneys above named to represent defendant. On the Friday night following said visit of Neel and Tye said Lang came to the jail and spent two hours or more with said Hughes and this defendant, endeavoring to induce both of them to testify on the trial of the Edmondson case what he had testified before the grand jury, and to go back on the statement made to said Neel and Tye. Said Lang went over all he had said before, and stated that said Hughes could get out of what he had told Neel and Tye by claiming that he was so sick at the time that he did not know what he had told them, and that the doctor would testify that his fever was 104 at the time [he] had made such statements to Neel and Tye, and that a man in that condition could not know what he was telling. The deputy sheriff Calbeck and Harry Wise were also present, and both of them joined in with said Lang, trying to persuade said Hughes to stand by what he had sworn before the grand jury, and to go back on his statement made to his attorneys, stating that it was the only way out of it for both of us. Neither said Hughes nor this defendant agreed to change the statement which we had made to our attorneys, and said Lang stated that he would give us twenty-four hours to decide what we would do about it, and that he would come back on the following night.

"On the following night Harry Wise came to see said Hughes and myself and insisted that both of us should change our statement as Mr. Lang had requested, stating that this was the only way out of it for us. He further stated that Lang had the power to put Hughes in jail and the power to take him out, and that if he, Hughes, would agree to Lang's request, that he, Wise, would do all he could to see Hughes out of it. Mr. Wise started to leave, and just then Mr. Lang came in and wanted to know what we had decided to do. Hughes told him he did not know what to do, and Lang again urged Hughes to agree to his request to turn State's evidence against Edmondson, to plead guilty to perjury, and again renewed his promise that if Hughes would do this, he, Lang, would see him out, and that he should not suffer for it. Said Lang was talking to both of us, and this defendant understood that his remark applied to both of us. Said Lang further stated that the railroad company had money, but had no power, and that he, Lang, had the power. After

being persuaded by said Lang, and acting under the fear of punishment, defendant finally agreed that if said Lang would turn him out he would turn State's evidence against Edmondson and file his plea of guilty to the indictment of perjury, and said Lang agreed that he would turn defendant out on these conditions. During the above conversation said Lang asked this defendant and Hughes if their witnesses were coming from Alabama for the trial Monday, and was told by Hughes that they were coming, and said Lang thereupon suggested that Hughes go down and telephone by long-distance to the witnesses not to come, and then added, 'No, that would not do, because I am afraid the railroad lawyers would find it out.' And he suggested that Hughes write a letter to his father and send it special delivery, telling the witnesses not to come. Hughes then suggested that there was no mail over there on Sunday, and said Lang then suggested that they could send some one and cut the witnesses off and turn them back. Said Lang then added that that would not do either, because Edmondson would be there with them. So the plan to stop defendant's witnesses was abandoned, said Lang saying it would make no difference anyway, as the court would rule out all that these witnesses declared.

"On Sunday night, March 21, Lang and Wise again came to this defendant and Hughes in their cells, and asked if they were going to stand by what they had told the night before, and defendant and Hughes agreed that they would do so if they would turn them out, and said Lang stated that he would guarantee that if they would do this he would send them back home by the following Saturday night. Said Lang further stated that the railroad lawyers would want to see Hughes and this defendant, and that he did not wish them to do so, and that he would arrange with the judge to keep them from seeing this defendant and Hughes. He further stated that he would have the judge bring this defendant and Hughes into court on Monday morning, and that the judge would ask them if they had any lawyer, and told them to tell the judge that they had no lawyer and did not need any, and to say that they were going to stick to what they had told the grand jury. Said Lang further stated that he was not after defendant and Hughes but was after John Edmondson; that Edmondson had fought him in his campaign for solicitor-

general, and done all he could against him, and had put out reports against him, and had spent money against him, and that Edmondson was the man he was after to put in the penitentiary, and was not after the small fry. He further stated that all the people in Calhoun were against Edmondson, and that all the jurors were against Edmondson, and if this defendant stuck to Edmondson this defendant would surely be in the hole and would go to the penitentiary. After talking with Lang this defendant thought about it during the night following, and decided he would not do what Lang had requested him, because it was wrong and because he had sworn the truth on the trial of the Knight case, and it would be a great injustice to Edmondson to swear a falsehood against him, as Lang sought to have this defendant do.

"Upon all the foregoing statement of fact and circumstances, this defendant avers and charges that at the time said Lang, as solicitor-general, instituted said prosecution, and in the preparation and presentation of the bill of indictment before the grand jury, was not only pecuniarily interested in the contingent fee in said Knight case, in which the alleged perjury was charged to have been committed, but that he was also actuated by motives of ill will and revengeful feelings against the said John L. Edmondson, and was seeking to use this defendant and said Hughes for the purpose of carrying out his purposes aforesaid, and is now conducting this prosecution against this defendant because this defendant will not further assist him in his prosecution of the said Edmondson as aforesaid, and is not a fair and impartial prosecuting officer, fit or qualified to represent the State of Georgia therein. And this defendant says that he could not have presented to the court his objection and exception to the said Lang acting as solicitor-general in the matter of preparation or presentation of said indictment to the grand jury before the finding or making of said indictment, because he did not know of the fact that the grand jury were considering the making of said indictment, until the action of the grand jury in making and finding said indictment had been had. Wherefore this defendant prays that this his plea be sustained, and that said indictment be quashed and go for naught."

Section 4929 of the Civil Code (1910) provides that, "when

a solicitor is absent or indisposed, or disqualified from *interest* or relationship, to engage in a prosecution, the presiding judge *must* appoint a competent attorney of the circuit to act in his place, or he may command the services of the solicitor-general of any other circuit accessible, or he may make a requisition on the Governor for the Attorney-General, as the emergency in his discretion may require". (italics ours). The solicitor-general is the official counselor of the grand jury, and represents the entire State, and should be absolutely free from any personal interest in any cause which he presents for their action.

In *Hicks* v. *Brantley,* 102 *Ga.* 271 (29 S. E. 459), the Supreme Court says: "A solicitor-general or prosecuting officer for a particular circuit has only the State for a client. He can not be employed by a private person to prosecute a case, nor to give advice. His is a public duty. He represents the entire public . . . As a prosecuting officer, the office of solicitor-general is a very responsible and important one. He is attorney and agent of the government in whatever concerns his office. He has to determine whether or not to commence a particular prosecution, or to discontinue one already begun. If it be not for the public interest to punish the doer where the law is but technically violated, he shall forbear the prosecution. The prosecutions which he inaugurates are by the people in the name of the State. He is controlled by the public interests, and while these interests require the conviction of the guilty, they forbid that of the innocent. . . . The solicitor-general draws the bill of indictment, examines the witnesses, not with a view to the interest of any client, but alone to subserve public justice." In *Baker* v. *State,* 97 *Ga.* 452 (25 S. E. 341), it was held, where the solicitor-general was himself the prosecutor in a criminal case, that a solicitor-general pro tem. should have been appointed before the indictment was acted upon by the grand jury; and in that case the Supreme Court said: "We shall undertake no discussion of the proposition that it is improper for a solicitor-general to appear before the grand jury in a case which he himself prosecutes personally. It is, of course, his right as a citizen to be the prosecutor in any criminal case; but as he is the official counselor of the grand jury, he could not with propriety appear before that body and give advice in a case in which he was personally concerned. In such

a case a solicitor pro tem. should be appointed before the indictment is laid before and acted upon by the grand jury." In the instant case the undisputed averments in the plea in abatement show that while Knight, the solicitor-general's client in the damage suit, was named as the nominal prosecutor, the solicitor-general himself was substantially and to all practical intents and purposes the real prosecutor in the case, and that he, as well as his client, Knight, was pecuniarily interested in it, and he was therefore disqualified from advising the grand jury when they were considering the finding of a true bill against the defendant.

This is not only good Georgia law, but is also the law of many other States. In Flege v. State, 93 Neb. 610 (47 L. R. A. (N. S.) 1106), one of the grounds of reversal was, that, over objection of the defendant, an attorney who had been employed or engaged in the prosecution of defendant by another suspected person was appointed assistant prosecutor, and the court held that "no attorney should be appointed who is known to be a partisan as against the accused, and who has theretofore been employed and paid by another suspected person," etc. And the court in that case quoted from Liniger v. State, 85 Neb. 98 (122 N. W. 705): "Public prosecutors and peace officers owe no greater obligation to the public than to a defendant charged with crime, and they should as zealously protect the one as the other." In McKay v. State, 90 Neb. 63 (39 L. R. A. (N. S.) 714), the court held that under the statute of Nebraska it was error to permit private counsel to assist in the prosecution, when such assistance was not procured by the county attorney under the direction of the district judge. And, among other things, the court said (p. 719): "Counsel thus procured [as provided by the statute] will not be actuated by sordid motives. He will enter upon the discharge of his duties in the same spirit that any honorable county attorney would enter upon the same, viz., with the desire simply to see that justice is done. It is just as much the duty of a county attorney to see that an innocent man is not convicted as to see that the guilty receive their just deserts."

In this State the solicitor-general, in assuming the duties of his office, must swear that he will faithfully and *impartially* discharge such duties, without fear, favor, or affection (Civil Code, § 4922). It is made a crime for him to take from anyone any-

thing to influence his action, or even to advise how the action of the grand jury, or the court, may be affected (Penal Code, § 804). And under section 4644 of the Civil Code the court is empowered to control, in the furtherance of justice, the conduct of its officers. The administration of the law, and especially that of the criminal law, should, like Cæsar's wife, be above suspicion, and should be free from all temptation, bias, or prejudice, so far as it is possible for our courts to accomplish it; and, in our judgment, public policy most emphatically forbids that a solicitor-general be allowed to present an indictment to the grand jury, or to advise them in the finding of a true bill for perjury against a witness, for alleged false testimony delivered against his (the solicitor's) private client, in a civil suit for damages, in the result of which he (the solicitor-general) is greatly and pecuniarily interested.

Under the law and the averments of the plea in abatement, it is as clear as the noonday sun in a cloudless sky that the solicitor-general was disqualified from presenting the bill for perjury in this case to the grand jury, and from advising with them in regard thereto. The court should have appointed a solicitor pro tem. to act in the matter.

The only remaining question then is, was this point made too late?' It is obvious that the question of the disqualification of a solicitor-general to appear before the grand jury in a particular case is an objection propter affectum. It is, of course, well settled that an objection propter defectum can be made after the return of the indictment, where it affirmatively appears that the accused had no notice of the charge against him and no opportunity of presenting his objections sooner. But as to whether an objection propter affectum can be so made, the authorities are not at all clear or harmonious. It is true that many of them hold generally that an objection of the latter class should be made as a challenge, before the indictment is returned; but in nearly all of these decisions the ruling is modified by the qualification that this is true where the accused had notice of the pendency of the indictment against him, or could, by proper diligence, have learned of it, and had an opportunity of raising the question before the indictment was found. *Williams* v. *State,* 69 *Ga.* 12; *Turner* v. *State,* 78 *Ga.* 174; *Lascelles* v. *State,* 90 *Ga.* 347, 372 (16 S. E.

945, 35 Am. St. R. 216) ; *Edwards* v. *State,* 121 *Ga.* 590 (49 S. E. 674) ; *Simpson* v. *State,* 110 *Ga.* 249 (34 S. E. 204) ; *Fisher* v. *State,* 93 *Ga.* 309 (20 S. E. 329) ; *Mills* v. *State,* 57 *Ga.* 610. In Hartgraves *v.* State (Okla.), 33 L. R. A. (N. S.) 568, it was held that where counsel privately employed to prosecute appeared before a grand jury and assumed to represent the State upon an investigation of a case then pending before the grand jury, an indictment found by the grand jury as a result of such investigation should, upon motion of the defendant, be set aside. And the court there said (p. 574) : "If such prosecutions were permitted, they would soon become a great scandal, and absolutely odious to a fair minded and justice loving people. Honest men against whom naught could be truthfully alleged have been greatly mortified, and have had their good names called in question, by just such proceedings as this, prompted alone by the malice and cowardice of their enemies, when, if they had been faced by their accusers, and given the right of cross-examination, those who sought to destroy them through the secret inquisitorial proceedings of a grand jury would have been covered with defeat and infamy." And in the note to that case in 33 L. R. A. (N. S.) are cited a number of cases where it was held that the presence of attorneys for the prosecution, or attorneys employed to aid therein, etc., before grand juries, invalidated the indictment. In Wilson *v.* State, 70 Miss. 595 (35 Am. St. R. 664), it was held that where an attorney of a party claiming to be injured by an alleged crime goes before the grand jury as a prosecutor, for the purpose of securing an indictment, the indictment, if secured, *must be set aside on a plea in abatement thereto.* In that case the court said: "It can not be doubted that one whose acts are there [before the grand jury] the subject of investigation is as much entitled to the just, unbiased, and impartial judgment of that body as he is to that of the petit jury on his final trial, nor that it is as essential before the one body as the other that private ill will or malevolence shall be excluded." In Biemel *v.* State (Wis.), 37 N. W. 244, it was held that an attorney paid by private parties appearing for the prosecution, upon the request of such parties and of the district attorney, but without appointment from the court, is not a proper attorney to aid in the prosecution, and a new trial was granted solely on that ground. In that case

the court said (p. 247): "The laws have clearly provided that the district attorney . . . shall be unprejudiced and unpaid except by the State, and *that he shall have no private interest in such prosecution.* He is an officer of the State, provided at the expense of the State for the purpose of seeing that the criminal laws of the State are honestly and impartially administered, *unprejudiced by any motives of private gain,* and holding a position *analogous to that of the judge who presides at the trial.* Such is the view taken of the office of prosecuting attorney by the courts of this country as well as of England, and we think is the true view of his position" (italics ours).

In 2 Thompson on Trials (2d ed.), § 2861, it is said: "If, however, advantage is taken of being before the grand jury to bring improper influence to bear on them, as, for example, where an attorney employed to prosecute was called as a witness and urged the grand jury to find an indictment, this presents good ground on motion to quash. The presence of any unauthorized person during deliberation is ordinarily held to presume prejudice and to require an indictment to be quashed. . . The rule as to prejudicial presence during deliberations applies to a prosecuting officer the same as that of another." In State *v*. Rocker, 130 Iowa, 239 (106 N. W. 645), it was held that the presence before a grand jury of a prosecuting attorney disqualified to prosecute a particular case was good ground for setting aside an indictment, and the court said: "Being disqualified, he should have moved the appointment of a substitute, as provided for in Code section 304. . . . While ordinarily it is the duty of the county attorney to attend upon the grand jury when required by that body (Code, § 307), there can be no warrant for his appearance when disqualified for reason of his having been attorney for the person charged in respect to the very matter under investigation. He is then a person not required or permitted by law to be before the jury. . . . It follows from what we have said, that the trial court erred in overruling the motion to set aside the indictment." In *Reich* v. *State,* 53 *Ga.* 74 (21 Am. R. 265), the Supreme Court held that "it is a good special plea to an indictment, if made on arraignment, that one of the grand jurors who found the indictment or special presentment was an alien, and not qualified to sit as a grand juryman." And in that

case (p. 75), the court said: "We think the plea that one of the grand jurors was not a citizen is a good plea. Section 3916 of the Code clearly contemplates that a grand juryman must be a citizen, and whilst the constitution does not, in terms, require it, and only uses the word 'persons,' yet there is nothing in this inconsistent with the Code; and this has long been the law of this State. . . So, too, we think the objection may be taken by special plea. There are some authorities seemingly to the effect that the challenge must be to the jury before bill filed; but it seems to us that this is unreasonable. How is a defendant to know that this secret inquest is proceeding to find a bill against him? Whatever objections there may be to a grand juror that a party can make ought (and this has always been the practice in this State) to be made on the trial, and before pleading to the merits; and such, we think, was the practice in England: 1 Chit. C. Law, 307; Bacon Ab., Juries (a), 727." It is true that in that case the objection was propter defectum, but, nevertheless, we think its reasoning can well be applied to the plea in the case at bar.

While we recognize that the general rule in Georgia is that an objection propter affectum to a grand juror should be made before the finding of the indictment (in *Betts* v. *State,* 66 *Ga.* 508, it was even held that a grand juror was not subject to challenge propter affectum), it has never been held in this State, so far as we know, that an objection of the same nature to the conduct of a solicitor-general must be so made. Indeed, under the express provisions of our statute (Civil Code, 1910, § 4299), a solicitor-general is clearly subject to challenge propter affectum, and, in our opinion, the question of his disqualification to appear before a grand jury can be raised by the accused at any time before pleading to the merits of the case, especially where it is affirmatively shown that the accused had no notice of the pendency of the indictment against him, and had no opportunity of making known his objections sooner. However, no matter what the general rule on this subject is, we think this case should be treated as an exceptional one. We have not been able to find another one exactly like it in any of the books. It differs materially from the case of a disqualified juror. The solicitor-general is the official counselor of the grand jury. They look to him for ad-

vice and counsel in finding true bills, and their actions thereon are nearly always guided by him. So it is much more injurious to a defendant to have against him, before the grand jury, a prejudiced solicitor-general than a prejudiced juror, for the influence of such a juror would not be nearly so great with the other jurymen as that of their official counselor and guide. Under the peculiar and particular facts of this case, as shown by the plea in abatement (the averments of which, being attacked by demurrer only, must be taken as true), the alleged conduct of the solicitor-general was so at variance with that impartiality and high ethical standard of one who is the "official counselor" of the grand jury, and who is "controlled by public interests alone," and who draws the bill of indictment and examines the witnesses before the grand jury, "not with a view to the interests of any client, but alone to subserve public justice," that in our judgment justice demands in this particular case that, if necessary, the general rule be relaxed. While the plea may have been subject to special demurrer, the court erred in sustaining the general demurrer to it and in striking the plea. Upon another trial, if the State fails to join issue upon this plea, or if, having joined issue upon it, the material averments therein are supported by proof, and the issue determined in favor of the defendant, the plea should be sustained and the indictment quashed.

The error in sustaining the demurrer to the plea and in dismissing the plea rendered the further proceedings nugatory, and a consideration of the other assignments of error is unnecessary.

*Judgment reversed.*

Russell, C. J., dissenting. I concur in the ruling in the first headnote, to the extent that I agree that upon well-settled principles a solicitor-general is disqualified to represent the State in a prosecution in the result of which he is interested either directly or indirectly. I favor the broadest construction of the foregoing rule of disqualification which will insure absolute impartiality in the trial of every person charged with crime. I think a proper plea in abatement, based upon the ground that the solicitor-general, J. M. Lang, was disqualified, by his interest in the civil case named (which was contingent upon recovery), from preparing the indictment or from conducting the prosecution against one who was charged with perjury, in delivering false testimony

in the very case in which the solicitor had a contingent interest, should have been sustained. However, since no rule is better settled or more salutary than that if the judgment of the lower court is for any reason right, it will not be set aside upon review, and since the plea in abatement is in my opinion plainly subject to demurrer upon the ground that the last twelve pages thereof (which relate solely to alleged acts of the person who held the office of solicitor-general, which were disconnected with the finding of the accusation and which tended by suggestion to illustrate the interest of the State's counsel) are irrelevant, immaterial, and scurrilous; and as there was no offer to amend the plea by striking these recitals, I think the trial judge was fully authorized to strike the entire plea. Furthermore, I am unable to concur in the implication which may appear to be sanctioned by the language used in criticism of the conduct of the solicitor-general. For these reasons I feel constrained to dissent from the judgment of the majority.