## VERNON *v.* THE STATE.

1. A solicitor-general is not disqualified to prosecute in his official capacity because he has employed associate counsel to assist him in conducting the prosecution, and himself pays the fee of such counsel.
2. It was error, requiring a new trial, not to submit to the jury the law of voluntary manslaughter.
3. It was not error to refuse a written request to instruct the jury as follows: "Mere threats and menaces may under some circumstances be sufficient to justify a killing. Any overt act of a threatening nature, short of an actual assault, is a menace. A menace is a show of an intention to inflict evil; to menace is to act in a threatening manner."
4. It was not error to admit evidence of the deceased's good character, nor to reject evidence of specific acts to show his bad character.
5. All other assignments of error are without merit.

> APRIL 12, 1917.

Indictment for murder. Before Judge Patterson. Cobb superior court. October 30, 1916.

James R. Vernon was indicted for the murder of L. L. Vernon. Upon the trial of the case, and before the full jury was selected and sworn, the defendant filed a motion to declare a mistrial, and asked the court to rule that the solicitor-general was disqualified to participate in the case, on the ground that he had employed counsel

to assist him in the prosecution, and was individually responsible for the payment of his fee. The court overruled the motion, and the defendant excepted pendente lite. The case proceeded to trial, and the defendant was found guilty of murder, with a recommendation to mercy. He made a motion for a new trial, which was overruled, and he excepted. Error was assigned on each of the rulings just stated.

The material evidence, as developed upon the trial, was in substance as follows: James R. Vernon, the defendant, shot and killed his father, L. L. Vernon, with a pistol. The deceased was between 66 and 68 years of age, an old man, and not in good health. The daughter of the deceased, who was about thirty-eight years of age, testified, among other things, in substance as follows: On the day of the killing she and her mother and father were in the home, the other inmates being out of the house. The daughter was in the dining-room alone, when her father came in and said: "Let's go to another room to the bed." She said: "I told him I would not do it. He then took hold of me, and said, 'Yes, come ahead. · . . I jerked loose and ran around on the back side of the table and hollered for mother." The mother ran in, and the father cursed her and told her not to try to attend to his business. The defendant and another man were at work some distance away in the field. The father called to them and cursed them, and told them to go to work, saying that it was none of their business. The father continued to curse the mother, and said, "I have a great mind to kill you." The daughter began to scream; and the defendant came to the house as quick as he could, and wanted to know what was the matter. The mother told him what had occurred. The father continued to curse the mother, and the defendant begged him not to do that way. The father offered to hit the mother and his daughter. The defendant caught him by the arm and told him not to do that, and held him, and told him if he would behave himself he would let him loose, and the father at last promised to do so. The defendant then let his father loose, and they both started out of the door, when the father began to curse the defendant, and told him to leave and not come back any more, and said, "I will kill you if you do." The defendant was going sideways out of the door, and the deceased was following him. The father continued to curse the defendant and said,

"Don't you come back here any more; I will kill you. God damn you, I will just kill you right now." The defendant said: "Get back. Stand back," three or four times. The sister had started out of the dining-room door, and got out just in time to see them. She said: "My father run his hand in his pocket and said, 'God damn you, I will kill you now,' and as he did that my brother shot him." A knife was found closed in the pocket of the dead man by the sheriff. The evidence of the mother agreed in the main with that of the daughter. She also stated that on Monday prior to the killing on Tuesday, the defendant was at her home and she told him how the father had talked to his daughter, Mary; whereupon the father cursed the mother. The defendant reproved his father, and told him to be ashamed of it; and the father told the defendant to go on back home, and shut his mouth, and if he didn't he would kill him, if he came back there any more meddling with his business. One witness testified that, about a year prior to the homicide, she had heard the defendant make threats to kill his father, if he "said anything to him." There was impeaching evidence tending to show that the daughter was not of good character, and evidence of contradictory statements made by her.

*Fred Morris, N. A. Morris,* and *George D. Anderson,* for plaintiff in error. *Clifford Walker, attorney-general, Herbert Clay, solicitor-general, J. Z. Foster,* and *M. C. Bennet,* contra.

GILBERT, J. (After stating the foregoing facts.)

1. During the trial of this case, and before a full jury was selected and sworn, counsel for the accused filed a motion to declare a mistrial, and asked the court to rule that the solicitor-general was disqualified, and for the appointment of a solicitor-general pro tem. to conduct the case, upon the ground that the solicitor-general had employed Mr. J. Z. Foster to assist in the prosecution of the case, and that the solicitor-general was solely and individually responsible for the payment of the fees of his associate counsel for his services in the prosecution. The court overruled the motion, and refused to declare a mistrial. We think there was no error in so ruling. We do not overlook the expression that the solicitor-general was "solely and individually responsible for the payment" of the fee of employed counsel. Considering that the interest of the solicitor-general was official only, and the duties to be performed by the employed counsel, the inference is that the

employment was by the solicitor in his official capacity for assistance to him in his official capacity, and that the payment for the services was to be made in the official capacity of the solicitor. To hold that this effected a disqualification would be unreasonable. If the employment of counsel to assist in the prosecution is a disqualification, why not the employment of a stenographer to assist the solicitor-general in a clerical capacity; and why not the incurring of any other incidental expense to enable him to better perform his official duties? The illustration might be carried on ad infinitum, and the inevitable result of such construction would be to tie the hands of the prosecuting officers, who are important factors in the efforts to suppress and punish crime. When these officers are overburdened with work, and are willing to compensate others to secure assistance in their manifold and arduous duties, their efforts are to be commended, rather than held to work a disqualification. The facts in the cases of *Baker* v. *State,* 97 *Ga.* 452 (25 S. E. 341), *Hicks* v. *Brantley,* 102 *Ga.* 264 (29 S. E. 459), and *Nichols* v. *State,* 17 *Ga. App.* 593 (87 S. E. 817), bear no relation whatever to the facts in the present case.

2. According to the rulings in *Rumsey* v. *State,* 126 *Ga.* 419, 423 (55 S. E. 167), *Mize* v. *State,* 135 *Ga.* 291, 296 (69 S. E. 173), and *Peterson* v. *State,* 146 *Ga.* 6 (90 S. E. 282), the evidence raised the issue of voluntary manslaughter. The court having failed to submit this issue to the jury, error resulted for which a reversal must follow. The evidence for the accused, if true, tends to show that he came to his father's house on hearing outcries by his sister, and on his arrival the sister related to him, in the presence of their father, the effort of the father to outrage her; that the father cursed the daughter vilely, and "started at her;" that the accused stopped him, and the father threatened to kill the son "and the last one" of them, and ran his hand in his pocket and started toward the accused. If this is the truth of the case (of which we express no opinion), the jury should have been allowed to decide whether or not these facts amounted to an actual assault, or to other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied. The decisions above cited, which were applied to similar facts, discuss the subject fully, and render any further elaboration unnecessary.

3.  Besides formally requesting the court to reduce his charge to writing, counsel for the accused presented in writing twenty-three formal requests to charge the jury, comprising seven typewritten pages.  These requests consisted in the main of numerous repetitions of the same principle, in language slightly varying, and in repetitions of the doctrine of reasonable doubt.  In so far as these requests were legal and applicable, they were appropriately expressed and included in the court's instructions to the jury.  It is a needless burden upon the trial court, as well as upon this court, to include in the record voluminous matter, consisting mainly of repetitions.  The rule is well established that the trial court is never required to repeat his instructions to the jury, however appropriate in principle, and correct in expression, a request for such repetition may be.

A number of these requests were, as stated in the brief of counsel for the accused, drawn from expressions found in the case of *Cumming* v. *State*, 99 *Ga.* 662 (27 S. E. 177).  Since all of these requests embodied the same principle, a discussion of one will suffice for all.  The court was requested to charge as follows: "Mere threats and menaces may under some circumstances be sufficient to justify a killing.  Any overt act of a threatening nature, short of an actual assault, is a menace.  A menace is a show of an intention to inflict evil; to menace is to act in a threatening manner."  The court did not err in refusing so to charge.  While such language is found in the *Cumming* case, it must be construed in the light of the whole case.  Separate sentences apart from the whole are calculated to mislead.  Language, however proper when used by this court in the discussion of a particular case, is often inappropriate as an instruction to be given by a trial judge to a jury in another case.  To say, without more, that mere threats and menaces may under "some circumstances" be sufficient to justify a killing would not only be misleading, confusing, and untrue, but would be in the teeth of the statute (Penal Code of 1910, § 65) and the whole line of judicial interpretation.  *Malone* v. *State*, 49 *Ga.* 210.

In the hope of clearing away and removing, as far as possible, a wide misconception of the *Cumming* case, supra, we take occasion to say what has already been said by this court in the strongest language.  The *Cumming* case was never intended to, and does

not, weaken or qualify in any respect the law against murder. The law of justifiable homicide has not been extended in any respect whatever by the decision in the *Cumming* case. In *Robinson* v. *State*, 118 *Ga.* 198 (44 S. E. 985), Mr. Justice Lamar, speaking for the court, said: "That words, threats, menaces, and contemptuous gestures will not justify the taking of human life is as old as our criminal law. It has been reaffirmed and re-enacted four times in this State." As was said in *Price* v. *State*, 137 *Ga.* 71 (72 S. E. 908): "One who slays for no other reason than that he is provoked by words, threats, menaces, or contemptuous gestures of the person slain is guilty of murder. Verbal threats or grimaces do not excuse a killing. On the other hand, the law justifies the taking of human life by a person under the influence of a reasonable fear that a felony is about to be inflicted upon his person, to prevent which he kills his adversary."

In *Deal* v. *State*, 145 *Ga.* 33 (88 S. E. 573), the question was squarely raised by a certification from the Court of Appeals. Mr. Justice Evans, speaking for this court, clearly, convincingly, and conclusively demonstrated the fact that the law of justifiable homicide had undergone no change. He said: "If one kills another solely because he is provoked by words, threats, menaces, or contemptuous gestures on the part of his victim, the statute brands the slayer as a murderer. The code section defining voluntary manslaughter deals with provocation as reducing the homicide; and not with conduct on the part of the decedent calculated to excite the fears of a reasonable man that a felony is intended against the slayer's person, or that his life is in imminent danger. Provocation is not an element in self-defense or justifiable homicide. *Adkins* v. *State*, 137 *Ga.* 81 (6) (72 S. E. 897); Wharton on Homicide, § 235. The plea of self-defense rests upon the idea of necessity, apparent or real, which in law will excuse one for so grave an act as the taking of human life. A plea of self-defense is not sustained where it appears that the slayer took the life of his victim solely because he was provoked by words, menaces, threats, or contemptuous gestures. Any attempt to inject the law of defense of person or life in the definition of voluntary manslaughter would tend to a confusion rather than a differentiation of these two phases of homicide. It is certainly the better practice in instructing the jury, where the law of voluntary manslaughter is applicable, to submit the question independently of the instruc-

tion on justifiable homicide." In *Malone* v. *State,* supra, the killing occurred in a brothel, and the defense was that the deceased put his hand on his hip and said: "I will shoot, you son of a bitch, if you touch my woman." Chief Justice Warner, recording the judgment of a unanimous bench in clarion tones which have never been surpassed, said: "These are the words, threats, menaces, and gestures which it is claimed, under the law, will free the defendant from the guilt and crime of murder in shooting the deceased. Only that, and nothing more. This court will avail itself of the present occasion to announce to the public from this bench, with all the emphasis which its judgment can impart, that provocation by words, threats, menaces, or contemptuous gestures will in no case be sufficient to free a person, who kills another by shooting him, from the guilt and crime of murder. The law so declares, and it is the imperative duty of the courts so to administer it, for the protection of society and human life. Mere words, threats, menaces, or contemptuous gestures are no considerable provocation in the eye of the law, and therefore malice shall be implied." Such was then the law, is now the law, and doubtless will ever remain the law.

4. It was not error to admit evidence to show good character on the part of the deceased. *Crawley* v. *State,* 137 *Ga.* 777 (74 S. E. 537). It was not error to reject evidence of specific acts to show the bad character of the deceased. *Andrews* v. *State,* 118 *Ga.* 1, 3 (43 S. E. 852).

*Judgment reversed. All the Justices concur.*