## 27359. LONG v. THE STATE.

DECIDED JULY 14, 1939. REHEARING DENIED JULY 29, 1939.

*M. G. Hicks, John W. Maddox, William T. Maddox,* for plaintiff in error.

*J. Ralph Rosser, solicitor-general, J. Sanle Crawford,* contra.

MACINTYRE, J. Arthur Long was indicted for murder, and was convicted of voluntary manslaughter. His motion for new trial was overruled, and he excepted.

On the question whether the death of the deceased resulted from the injuries, from disease, or from criminal agencies, the testimony was in part as follows: Dr. Chandler, who attended the deceased a short time after he was shot, testified: "It seemed that the gun was fired from up over him, shot down from the side. The bullet didn't go in his abdomen; it went through his arm and his lung and kinder down the spine. . . I did not probe that wound. I had an x-ray of it, and it must have gone fifteen inches down through his body. I saw that bullet lodged in there. He had three wounds. I thought one bullet caused it all. I treated

him over a period of about three weeks, the whole time, for this injury. I didn't consider him entirely recovered; he was sort of resting up, and I sent him on home" (from the hospital). After he went home, "I was treating him for syphilis, but he did not die from that. . . As to whether the gunshot wound in his body would have killed him, I will say it was a severe injury, but not ordinarily the kind to kill a human being. I don't know whether that gunshot wound produced his death or contributed primarily to it. It is a common known fact that you can kill a man with a pistol. As to the size of the bullet that went in his body, I didn't get any of those, it was a pretty good-sized hole." Dr. McCall, who attended the deceased while he was in the hospital but did not see him at any time thereafter, testified: "That was a deep wound, there is a possibility it would kill a human being. I have no idea what produced this negro's death. . . I would say, as a medical opinion, that there was a likelihood of a blood clot lodging in his heart, as the most likely cause; of course I couldn't say definitely that could have caused his death. As to whether or not that would have been most likely the result of the gunshot wound or some other condition, it could have been from either one of them. It isn't usual for a person suffering with syphilis to die from a blood clot in the heart, but it is possible."

The deceased died suddenly, about a month after he was shot, in a room in his sister's house in the presence of a negro woman. It therefore seems to us that there was proof that the wound inflicted on the deceased was made with a deadly weapon, and was of such a character as to authorize the jury to find that this wound was the proximate cause of the death. Here is a man who was shot with a bullet that made "a pretty good-sized hole," and, indeed, it penetrated his body about fifteen inches, going through the lung and resting on the vertebra where it was at the time of his death about a month after he was shot, he having been released from the hospital about a week before his death. The syphilis for which he was treated before and after he was shot, according to the doctor who went to see him about two days before his death, pursuant to a treatment for syphilis, was not the cause of his death, the doctor's testimony being that the deceased "did not die from that" (syphilis). Other than the fact that the deceased was suffering from syphilis, unless the suddenness of his death can be considered

as a symptom, there were no signs or symptoms of any other disease or any other cause of death. There were no signs or symptoms that death resulted from accident or other cause, or from suicide. It is true that the doctors never examined him relatively to the wound after he left the hospital; and it seems to us that it was for this reason that they would not swear whether or not he died from this wound; in fact, that they would not give their professional opinion as to what caused his death. Nevertheless we think that here, where the wound of the character stated above was described to the jury, and the deceased was treated therefor in a hospital for three weeks and was released from the hospital, and a week thereafter he suddenly died, and where there were no other signs or symptoms that he died from any disease or other cause, it was a jury question as to whether the bullet which made "a pretty good-sized hole" and penetrated fifteen inches into his body, and was still resting on a vertebra of his backbone at the time of his death about a month thereafter, was the proximate cause of his death, or whether his death resulted from natural or other causes. *Thomas* v. *State,* 67 *Ga.* 460; 3 Warren on Homicide, 189. See *Wells* v. *State,* 46 *Ga. App.* 412 (167 S. E. 709). The fact that the doctors would not swear positively that the death resulted from the wound or other causes, would not prevent the jury, after hearing a description of the wound which had been inflicted, from determining for themselves whether or not the wound was the cause of the death; and if the jury decided that the wound was a cause sufficient to produce the death, and no other cause was shown to have existed, there was sufficient basis for the conclusion that death resulted from the wound rather than from some other cause, the existence of which there was not the slightest evidence to establish. If it were necessary to negative every other possible contingency which might have produced the death of the deceased, conviction of crimes of such violence would be a rarity. People *v.* O'Connell, 78 Hun. (N. Y.) 323, 327.

■ When a wound from which death might have ensued had been inflicted with a murderous intent, and had been followed by death, and there was no testimony whatever even tending to show that the loss of life did not arise from a gunshot wound fifteen inches long, inflicted by the defendant, and from the fact that the bullet, which passed through the lung, was still resting on a verte-

bra in the lower region of the deceased's spine at the time of his death about a month after he was shot, instructions on assault with intent to murder, based on the theory that death was caused by a disease not put into operation by the wound or on the theory that death resulted from some cause other than the wound, would have been abstract, and were not required, for the reason that there was no testimony calling for such instructions. 30 C. J. 139, § 346; Bellamy v. State, 56 Fla. 43 (47 So. 868) ; Edwards v. State, 39 Fla. 753 (23 So. 537) ; State v. Briscoe, 30 La. Ann. 433; U. S. v. Abiog, 37 Philippine, 137. Williams v. Commonwealth, 13 Ky. Opinions, 1069; Wood v. State, 31 Tex. Cr. 571 (21 S. W. 602) ; Tincher v. Commonwealth, 253 Ky. 623 (10) (69 S. W. 2d, 750). The mere fact that the deceased was suffering from syphilis, which his attending physician testified did not cause his death, does not change the rule.

The evidence authorized the verdict.

*Judgment affirmed. Broyles, C. J., concurs.*

GUERRY, J., dissenting. I can not agree with my colleagues in this case. The matter which causes me to disagree is the question as to whether the pistol-shot wound inflicted by the defendant on the deceased was the cause of his death. The evidence discloses that the deceased was shot December 23, and was treated by a doctor at a hospital within fifteen minutes thereafter. He was discharged from the hospital either on December 28, or within ten days, and died sometime in January, within three weeks or a month from the time he was shot and about two weeks after he was discharged from the hospital. From the evidence we know only that he died one morning; no witness was presented to give any of the immediate circumstances of his death. So far as the record appears he died suddenly. The doctor who had been treating him for syphilis for a long time before he was shot stated that the deceased was in the secondary stage of syphilis, and that he attended the deceased at a hospital within fifteen minutes after he had been shot. He testified: "He got better at the hospital, and was able to go home. I don't know what caused his death; he died suddenly. Whether he died from a heart attack or from a ruptured blood vessel in his brain or heart—I don't know what caused his death, nor what contributed primarily, although I am a practicing physician. . . He apparently recovered from the gunshot

wounds, from a physical examination he had, to my satisfaction. I did not examine him after he was dead; but had, a day or two before he died. I examined him then because I was treating him for syphilis." Both doctors testified that the fact that the bullet was lodged near the vertebra did not cause his death; that it was possible for such a wound as that inflicted to cause a person's death, but that it was not ordinarily the kind to kill a human being. The second doctor, who also treated the deceased while he was in the hospital, swore: "I have no idea what produced this negro's death. I would say, as a medical opinion, that there was a likelihood of a blood clot lodging in his heart, as the most likely cause; of course I couldn't say definitely that could have caused his death. As to whether or not that would have been most likely the result of a gunshot wound or some other condition, it could have been from either one of them. It isn't usual for a person suffering from syphilis to die from a blood clot in the heart, but it is possible."

It is essential that the State prove beyond a reasonable doubt, not only that the defendant administered the wound, but that the deceased died as a result of that wound. In 3 Warren on Homicide, 285, § 277, it is said: "A proximate relationship or connection between the assault and death must be proved beyond a reasonable doubt." In *Daniel* v. *State,* 126 *Ga.* 541, 542 (55 S. E. 472), it was said: "The burden was upon the State to show beyond a reasonable doubt, not only that the accused inflicted a wound under such circumstances that if death ensued the accused would be guilty of murder, but also to a *like degree of certainty* that death *actually resulted* from the wound inflicted." (Italics mine.) Quoting again from Warren on Homicide: "Evidence that shows an obscure or a merely probable relationship or connection is insufficient. There is not sufficient proof to sustain a conviction, where there is a reasonable doubt as to the cause of death." In State *v.* Rounds, 104 Vt. 442 (160 Atl. 249), it was said: "In homicide case, causal connection between death of decedent and unlawful acts of respondent can not be supported on mere conjecture and speculation." I quote again from 3 Warren on Homicide, 287, § 277: "Evidence that does not disprove that death resulted from accident, natural causes, or suicide, is insufficient."

In this case, before the jury would be authorized to find that the wound inflicted on the deceased by the defendant was the cause

of the death, they must be able to say that the circumstances relied on supported this hypothesis and excluded every other reasonable hypothesis. The doctor who had been treating the deceased before he was shot, and who treated him immediately after he was shot, discharged him from the hospital as being able to go home. He went to see the defendant two days before he died, not to treat him for the wound which had apparently healed, but for a previous complaint, that of syphilis. This doctor was an expert. He knew the character and extent of the wound, which, according to his testimony, was not a wound which would ordinarily produce death. He was put on the witness-stand by the State, and swore repeatedly that he would not be able to say, nor would he say, that the wound contributed to the death of the deceased. The other doctor who also treated the deceased for his wound swore that he could not say what caused his death; that any answer he might make would be entirely guesswork. In spite of the testimony of experts who swear they could only speculate as to the cause of the death, may a jury say, or may this court say, "We know and are convinced beyond a reasonable doubt that the wound inflicted caused the death?" Neither we nor the jury saw the wound. The description of its character and extent we learn from these doctors. Can it be said that the jury's common knowledge is so superior to that of the sworn expert witnesses that it knows absolutely, while the experts (the doctors) still "see through a glass darkly?" There are a number of elements to be taken into consideration, among which is the time that elapsed. The deceased had been discharged from the hospital, apparently as cured of the wound, at least two weeks before he died. There is no evidence that his wound or injury confined him to his home, or that he was not able to travel about and perform his work. Can we or a jury do other than speculate as to what length of time must elapse before we can say that death was not from some cause other than the infliction of the wound? To my mind there is nothing more than a conjecture or a speculation that relates the death to the wound. The proof required is not that it might have been occasioned by the wound, but it must be shown that the wound, and not any other cause, occasioned the death.