29252. HICKS *v*. THE STATE.

DECIDED JANUARY 27, 1942.

*C. H. Dalton,* for plaintiff in error.
*H. G. Vandiviere, solicitor-general,* contra.

MACINTYRE, J. Only headnote 6 will be discussed. Melvin Hicks and Johnnie Walker were jointly indicted for the murder of John Sisson by shooting him with a shotgun, "thereby inflicting a certain mortal wound and certain mortal wounds from which he, the said John Sisson, then and there died." Hicks was found guilty of voluntary manslaughter. His motion for new trial was overruled, and he excepted.

The defendant, Walker, and Sisson were all employed at a sawmill in north Georgia, Walker having, two weeks before the occasion in question, come down from Tennessee to work. It appears from the testimony that one week-end the owner of the sawmill, being absent for a few days, left Sisson in charge of the mill and other equipment. Walker and the defendant went to spend Saturday night with Sisson, who occupied a small one-room shack near the mill. During the night, at the suggestion of Sisson, Walker left the shack to get a quart of whisky. After the three disposed of this, Walker obtained two more quarts. Out of this drinking a drunken carousal arose in the shack, in which there was cursing on the part of both Sisson and the defendant. At one stage in the carousal the stove in the shack was turned over by the defendant, and some coals fell upon the floor. Walker extinguished the fire with sawdust. Later, there was more cursing by the defendant and Sisson. Sisson, along with the other cursing, cursed the defendant and Walker and ordered them out of his shack. Walker testified that the following then occurred: "There was some cursing there between Sisson and Hicks, and one of them called the other a son of a bitch. I think Sisson called Melvin [the defendant] a son of a bitch. . . When the trouble got up between Hicks and Sisson and Hicks went out, he carried that shotgun with him. Then, when he cursed him [the defendant] and told us to leave, Hicks came around the side of the house and told Sisson if he didn't shut that door he would shoot him; but he did not shut the door. Then Hicks shot once up through the woods. At that time Hicks was right back out in front of the door. Then he shot again." As to whether or not he shot into the door at that time, "Yes, he shot in that direction; and at that time Sisson was standing there in the door with his hand holding the door open. I don't hardly know how far Hicks was from that door when he shot, but I guess he was ten or fifteen feet, or maybe further than that. I was on out past Hicks at that time, directly behind him. As to whether I could see into the shack then or not, well, it was dark in there, kinder, but I could see Sisson in the shack. He was standing there. I didn't see Sisson fall; the door just eased to. Then we left and went on up to our shack. . . As we went along up to our shack with reference to having shot John Sisson, he [defendant] said he might have hit him.

We got up the next morning about six o'clock . . and went on back down there [to Sisson's shack]. When we got down there was when we discovered about Mr. Sisson being dead. Then we went on back up to the shack and washed and combed our hair and went over there and got Grady Hensley to take us to Kate Hill's. We told Grady Hensley a man got burned up there in the shack."

Walker and the defendant left Sunday night for Tennessee and were later arrested there. In his statement to the jury the defendant stated: "I stepped around the corner of the building [Sisson's shack], and I told him [Sisson] if he wanted to get me he would have to come out there, that I was not going inside; and he stomped around on the bed and cursed, and he reached down there and picked up a butcher knife and drew it back like he was going to throw it at me. And about that time he kicked the cover off and uncovered this pistol that Walker had put under the bed because he said that Sisson was too drunk to have it, and he got that in his hand, and he had his knife in this right hand and his pistol in his left hand, and he started to step off of the bed and I told him not to come out there that I would shoot him. My gun was lying out by the side of the feed shack twenty or twenty-five feet in front of the door, and I went out there and got my gun, and I shot once up through the woods as he was stepping off of the bed. And he was starting on towards the door and I started turning around and taking the gun down from my shoulder, and I had my side next to the shack door, and the left barrel went off. I didn't put the gun to my shoulder, and it reared right straight up in my face. Walker was standing about fifty yards up the road, hollering 'Come on and let's go,' and I went on up the road to where he was."

Mr. Ed. H. Rackley, the sheriff, testified that he had one conversation with the defendant in which the defendant stated that he had no trouble or difficulty with Sisson. That when he and Walker left Sisson's shack Sisson was lying on the bed and that he did not have a shotgun. The sheriff further testified that he had another conversation with the defendant in which the defendant "said they were down there that night later than nine o'clock, and had a little trouble. He said that Walker got some liquor there and they all got to drinking a little and had a little fuss, and he shot to scare

Mr. Sisson, in the door twice, I believe he said. And at the time he shot twice he said that Mr. Sisson was standing in the door cursing him. And I believe he further said that Sisson had a knife in one hand and a gun in the other at that time, a pistol. He said he had a hunting knife or a butcher knife. . . Hicks said when he shot there he was in front of the place kinder, between this shack here and where this hay was," which was just a few steps from the shack. It appears from the testimony of other witnesses that gunshot wadding was found in front of the door to the shack. Sisson's body was found lying on his right side and burned to a crisp, with his feet about even with the door. His head was over to the side and his left arm was stuffed in an eight-pound lard bucket which was "mashed plumb over on his arm there." Blood "was caked" on the body and was coming out of it in two places, from a hole in his chest and throat, and from a "good big hole" in his right side, from which one could see his entrails. His right arm was burned off and his legs were burned off above the knees.

The defendant contends in his brief that the evidence does not authorize the verdict because "the deceased could have died from being burned while asleep and drunk. And never have been shot at all." The evidence, viewed in its most favorable light to upholding the verdict, authorized a finding that the deceased, standing in the doorway, was shot by the defendant standing within ten or fifteen feet from the deceased, and that thereupon the door to the shack closed or "eased to." The shooting occurred prior to midnight; the body was found in the ashes and remains of the burned shack the next morning, and it was not in a position that would indicate that the deceased was burned up while he was asleep, but was in a position that would indicate that he fell at or very near the place where he was standing at the time he was shot by the defendant, and the body was thereafter burned "to a crisp." Yet, even though the body was burned in the manner described above, there appeared to be a hole in the neck or shoulders of the body near the neck, and it appeared as though blood had flowed from the wound and also another wound in the stomach where it appeared the intestines of the deceased had been punctured and the entrails could be seen. It is true that the coroner, not a doctor, but a mere layman, testified that at the inquest he cut into the

body, which had been burned to a crisp, and found no shot (but found much blood therein), but the jury may have believed that the evidence of a layman as to probing and cutting into a dead body to see if there were any shots therein, and finding none, did not satisfy them that no shots were there; or at least did not in their opinion overcome evidence which, viewed in its most favorable light to upholding the verdict, authorized a finding that the defendant, within ten or fifteen feet from the deceased, shot at him and then and there inflicted a wound or wounds which caused his death.

"The possibility that death resulted from some other cause than that charged does not require an acquittal if from all the evidence the jury are satisfied beyond a reasonable doubt that the accused is guilty." 26 Am. Jur. 490 (15). "In *Cargile* v. *State*, 136 *Ga.* 55 (3), 56 (70 S. E. 873), the following charge was approved: 'It does not require any greater degree of mental conviction to base a verdict on circumstantial evidence that it does upon positive testimony. Whether circumstantial or positive, if the evidence satisfies your minds beyond a reasonable doubt of the guilt of the accused, it would be your duty to convict; otherwise it would be your duty to acquit.' " *Wrisper* v. *State*, 193 *Ga.* 157 (17 S. E. 2d, 714). The primary question is not what did not cause the death, but what did cause the death. Relative to the determination of whether the gunshot wounds killed the defendant as charged, or whether his death was caused independently of such wounds by the burning of the shack, it is not an absolute requirement that the State negative every possible contingency that might have produced death other than the gunshot wounds; for if this were the only method authorized, and the State had to eliminate every possible cause that might produce the death except the gunshot wounds before the jury were authorized to convict, a conviction of crimes of such violence would be a rarity. *Long* v. *State*, 60 *Ga. App.* 517, 519 (4 S. E. 2d, 75). It is not incumbent on the State to show that it was impossible for the burning of the shack to have caused the death of Sisson, or that it might be barely possible it caused the same, but if the State shows the jury to a moral and reasonable certainty and beyond a reasonable doubt that the gunshot wounds caused the death, this is sufficient. *Houser* v. *State*, 58 *Ga.* 78; *Cargile* v. *State*, supra. When the proved facts leave

no ground for rational doubt, that is, a doubt based on reasonable inferences such as are ordinarily drawn by ordinary men in the light of their experiences in ordinary life (*White* v. *State*, 18 *Ga. App.* 215, 89 S. E. 175), the mere possibility that death resulted from some cause other than the gunshot wounds, as was charged, does not overcome the evidence which satisfies the jury beyond a reasonable doubt that the gunshot wounds caused the death.

When we look at the complete picture portrayed by the evidence in the instant case, we think the jury were authorized to find that upon no reasonable hypothesis arising from the evidence can the defendant be exonerated from the felonious connection with the injuries which were the proximate cause of the death of Sisson. The State carried the burden of showing that the defendant shot Sisson with a shotgun, and that the gunshot wounds then and there inflicted were adequate, and calculated to produce, and did produce his death. State *v.* Hambright, 111 N. C. 707 (16 S. E. 411). "It is not necessary that the body of the deceased should furnish the evidence of the fact that death was caused by criminal means. The admissions, statements, and acts of the accused, or any other competent proof, is admissible and proper to show that death was not due to natural sickness, suicide, or accident, but to some criminal agency. If evidence of this character is produced which is sufficient to establish beyond reasonable doubt that the death was the result of a criminal act, then the corpus delicti is proved." Dunn *v.* State, supra; 30 C. J. 288 (72, 73). To adopt the language of Justice Grice in *Wrisper* v. *State*, supra, "to hold that the State, in a situation such as is here presented, must produce more definite proof than was done as to the means by which death was inflicted might be the equivalent of requiring the impossible."

*Judgment affirmed. Broyles, C. J., and Gardner, J., concur.*