WEAVER *v.* THE STATE.

No. 15422. APRIL 3, 1946.

600

*Abit Nix, Joseph E. Webb,* and *P. J. Smith,* for plaintiff in error.

*Eugene Cook, Attorney-General, D. M. Pollock, Solicitor-General,* and *C. E. Gregory Jr., Assistant Attorney-General,* contra.

CANDLER, Justice. (After stating the foregoing facts.) ■ When a son of the defendant was on the stand as a witness, the trial judge refused to permit the son to answer a question as to whether on another occasion the deceased had cut the son. The defendant contends that, if the witness had been permitted to respond to the question, he would have answered that the deceased cut him, and that the reputation of the deceased for violence was bad. Further, in the same special ground, it is contended that

the evidence showed that the deceased was the aggressor and had brought the fight to the defendant. The defendant contends in his brief that the failure to admit this evidence was harmful, for the reason that it would have established the fears of a reasonable man at the time and place of the shooting.

After an examination of the evidence and the statement of the defendant in the trial court, we do not find anything that would lead us to the conclusion that the deceased was the aggressor. One of the witnesses for the defendant claimed to have heard Mary Bell (the person shot) say as she was leaving the automobile, "Let me get my God damned blade;" and another witness for the defendant testified that she said, "Let me get my God damned blade out." If it be assumed that the testimony of these witnesses was correct, the statement actually made by Mary Bell was not, under the circumstances, any indication of aggression on her part, especially where her words were not coupled with any affirmative act of aggression, but the words may have been consistent with the idea of defensive precaution. Neither the defendant nor his witnesses saw Mary Bell with a knife at the time she was shot. No knife was found. There was positive testimony that she did not have a knife. An eyewitness testified that she was backing towards the automobile in which she had come to the cafe, with a smile on her face, when Richard Weaver pulled a pistol from behind him and shot her. Substantially the same was testified by several other witnesses, all negativing any idea of aggression on her part.

In support of his contention that the testimony was admissible, the defendant cites, and relies on *Rawlins* v. *State,* 124 *Ga.* 31, 45 (11) (52 S. E. 1), which reads as follows: "Evidence was admitted tending to show that there was a state of bad feeling between the Carter family and the Rawlins family, and especially between the heads of the two families. This evidence was objected to on the ground that the evidence of bad feeling should be limited to any bad feeling that might exist between Milton Rawlins and the children that were killed. There was no merit to this objection. The state of feeling existing between the father of the accused and the father of the deceased was pertinent, and especially was it pertinent to show a state of bad feeling generally between the two families. The weight, of course, to be given to this testi-

mony was to be determined by the jury in ascertaining whether there was a motive for the accused on trial to commit the crime with which he was charged." We do not think that the authority cited is applicable to the present question.

One of the objections to the testimony, made at the trial, was that the character of the deceased could not be attacked by proof of specific acts and without showing that she was the aggressor. A defendant cannot by his own witness on direct examination show a general character for violence on the part of the deceased by proof of specific acts. *Warrick* v. *State,* 125 *Ga.* 133 (6) (53 S. E. 1027); *Vernon* v. *State,* 146 *Ga.* 709 (92 S. E. 76); *Hamby* v. *State,* 71 *Ga. App.* 817 (32 S. E. 2d, 546). There being no evidence that the deceased was the aggressor, it was not error for the trial court to reject the testimony offered by the defendant's witness which might have tended to show the general character for violence, because "proof of the violent and turbulent character of the deceased is admissible only when it is shown prima facie that the deceased was the assailant, that the accused had been assailed, and that the defendant . . was honestly seeking to defend himself." *Crawley* v. *State,* 137 *Ga.* 777 (74 S. E. 537); *Hamby* v. *State,* supra; *Hanye* v. *State,* 99 *Ga.* 212 (25 S. E. 307); *Gardner* v. *State,* 90 *Ga.* 310 (17 S. E. 86, 35 Am. St. R. 202); *Drake* v. *State,* 75 *Ga.* 413; *Doyal* v. *State,* 70 *Ga.* 134 (5a). The same rule is applicable, even though the defendant may in a statement at the trial undertake to lay the foundation for such evidence by claiming that the deceased was the aggressor. *Chapman* v. *State,* 155 *Ga.* 393 (117 S. E. 321); *Jones* v. *State,* 154 *Ga.* 423 (114 S. E. 326). Accordingly, the matters complained of in the first special ground are without merit.

■ The defendant contends that the evidence does not make out a case of murder, because the testimony of the physician is to the effect that the deceased had been considered on her way to recovery so far as the gunshot was concerned, and that her death was due to another and independent cause. Apparently there is no question as to the severity of the gunshot wound. The intestines were found to be punctured in five places and at one place almost severed. She had four wounds in the misentery. The bullet ranged downward from the level of the umbilicus and lodged inside the left pelvis, but the bullet was not removed. It is not

disputed that her condition was critical until about a week before she went home. She was shot on July 22 and died on September 14. After being in the hospital one month and five days and seemingly on her road to recovery, she was permitted to go home, where her wound was dressed by a nurse. On the day before she died the physican was notified that she had a cold and he prescribed for it without seeing her. The next afternoon the physican saw her in the hospital just before she died. Her pulse was very weak and she was in a cold perspiration. The gist of the defendant's contention in this special ground seems to be based on the portion of the testimony of the attending physician elicited on cross-examination, as follows: "When she left the hospital, I thought she was getting along fine. . . When I did see her on the 14th of September, she was suffering from a thrombus and the woman was practically dead. An autopsy would have settled that question. I could not tell the jury the cause of her death without an autopsy. I told the nurse to see whether they would have an autopsy, and she said that they did not seem to want to do it. I even advised the sheriff of this county and told him she had died. Without an autopsy I can not be positive in my testimony as to what caused it; we have symptoms though. It is possible for people who have never been shot to have a thrombus. I am satisfied she had a thrombus, but I am not sure where it came from." Whatever uncertainty, if any, this testimony of the physician might have when standing alone, is explained satisfactorily when considered together with his direct and redirect testimony, which was as follows: "As to what she died of right at that time, from the history that I got, I am satisfied she died from a thrombus, as we considered pneumonia would not have killed her that quickly. My opinion is that it was a thrombus. A thrombus usually follows a traumatic injury, which would be in the form of a blood clot that would form in the small vessel and push up and swell up a little larger, and finally when it hit the lung or heart it is too large and kills. It is a blood clot. As to whether a blood clot is somewhat usual and sometimes develops from an operation or wounds, sometimes it will develop from the smallest operation. I would say, in my opinion, most likely the gunshot wound was the cause of her death. As to whether I would say it was the proximate cause of her death, I do not know of any other

reason. She was a well-made negro woman and well nourished. She was a strong negress before the injury, no doubt. It is my testimony that in my opinion her death was caused by a gunshot wound. In that death certificate I stated the cause of her death to be a thrombus, and I put 'gunshot wound' as the real factor. I put thrombus following gunshot wound, and that is not to say that the gunshot wound or pistol caused that. There is no way to tell it, and if we had made an autopsy in the heart or brain, we would not know exactly where it came from. She gave her age in the hospital as being twenty-three years old and she also gave me her age as twenty-three." ·

There is no suggestion of negligence or unskilled treatment of the gunshot wound, but if the deceased had failed to receive skilled treatment of the wound which was the primary cause that produced other and secondary causes from which the death resulted, the accused would not be relieved of the responsibility for the death of the deceased. *Downing* v. *State,* 114 *Ga.* 30 (2) (39 S. E. 927); *Bonner* v. *State,* 125 *Ga.* 237 (1, 2) (54 S. E. 143). In *Long* v. *State,* 60 *Ga. App.* 517 (4 S. E. 2d, 75), in the majority opinion of two of the three judges of a division, it was held: "Where the defendant shot the deceased with a pistol, inflicting a wound in his body fifteen inches long, and the bullet passed through his lung and was resting on a vertebra in the lower part of the deceased's spine at the time of his death about a month after he was shot, and where the defendant immediately after he was shot was taken to the hospital where he was treated for about three weeks and was then discharged from the hospital and went home, lived for about a week, and then died suddenly, there was a sufficient basis for the conclusion that death resulted from the wound rather than from some other cause, the existence of which there was no evidence to establish." The *Long* case, supra, was on its facts weaker than the present case as to medical opinion of what caused the death, because in the *Long* case the doctors failed to give their professional opinion of what caused the° death, stating only that syphilis did not cause it, but in the present case the gunshot was given as the proximate cause. See also *Brown* v. *State,* 10 *Ga. App.* 216 (73 S. E. 33); *Wells* v. *State,* 46 *Ga. App.* 412 (167 S. E. 709), and citations; *McLain* v. *State,* 71 *Ga.* 279; *Brundage* v. *State,* 70 *Ga. App.* 696 (29 S. E. 2d, 316), and cita-

tions; *Wilson* v. *State,* 190 *Ga.* 824 (10 S. E. 2d, 861). In the *Wilson* case, supra, the deceased lived from January 31 until October 4, and the immediate cause of her death was an infected lung. However, the physician testified that the primary cause of her trouble was the wound on her head, and that the infection was secondary, resulting from low resistance caused by the injury and shock resulting therefrom. In that case, this court held that the evidence was sufficient to authorize the verdict. The evidence in this case authorized the jury to find that the deceased was shot with a pistol by the accused, and the facts with reference to the nature of the wound inflicted upon the deceased were before the jury. The only other illness shown was that the deceased had contracted a cold, and the doctor testified definitely that in his opinion that illness was not the cause of her death. From the testimony with respect to the age and physical strength of the deceased, the nature of the injury, and the circumstances surrounding her death, the jury was clearly authorized to find beyond a reasonable doubt that death resulted from the wound inflicted by the accused and not from any independent cause. Therefore special ground 2 is without merit.

■ There was ample evidence to authorize the verdict and it was not erroneous to overrule the general grounds of the motion for new trial. *Judgment affirmed. All the Justices concur.*