1. An accused on trial for murder cannot by his own witness on direct examination show general character for violence on the part of the deceased by proof of specific acts.
(a) And where there is no evidence that the person killed was the aggressor, it is not error for the trial court to reject testimony offered to show general character of the deceased for violence, because proof of the violent and turbulent character of the deceased is admissible only when it is shown prima facie that the deceased was the assailant, that the accused had been assailed, and that the defendant was honestly seeking to defend himself.
(b) The same rule announced in (a) above is applicable, even though the defendant may in a statement at the trial undertake to lay the foundation for such evidence by claiming that the deceased was the aggressor.
2. Although the person receiving a gunshot wound in the intestines on July 22 did not die until September 14, and the attending doctor testified that death was caused by a thrombus, stating also in his opinion that most likely death was caused by the gunshot wound, there was not such uncertainty of proof of death from the gunshot wound beyond a reasonable doubt as to require a new trial, especially since there was an abundance of evidence before the jury relating to the severity of the wound, as well as a lack of showing of any other independent cause of death.
3. There was ample evidence to authorize the verdict, and it was not erroneous to overrule the general grounds of the motion for new trial.
 No. 15422. APRIL 3, 1946.
Richard Weaver was convicted, with a recommendation of life imprisonment, and so sentenced for the murder of Mary Bell. His motion for a new trial, on the general grounds and two special grounds, was overruled. The exception is to that judgment. *Page 599 
The evidence for the State, was, in substance, as follows. Robert Williams testified: That he first saw Mary Bell Sunday afternoon, July 22, 1945, at Robert Walker's cafe on Church and Broad Streets (in Athens, Georgia). Her husband (sometimes called "Georgia Boy"), George Wise, the driver, and another girl were in an automobile, when the witness Williams got in the car with them. They went from Walker's cafe to Philip Elder's cafe. This was right after a ball game. When they reached Elder's, he saw Richard Weaver before the car stopped. The witness Williams got out of the car and went to Richard Weaver to ask the latter for a loan of money. The others remained in the car. Weaver told Williams that he had no money. Then the others in the car walked up to where Weaver and Williams were standing. Weaver said to Mary Bell, "Go ahead, I am talking to Robert Williams." They were close enough to shake hands. No one made a threatening move. Mary Bell had her arms folded. When Weaver repeated the same words quoted above for the third time, Mary Bell stepped around in front of him. She did not move. She had not said anything. Richard Weaver pulled out his pistol and shot Mary Bell. The witness did not know what Weaver shot her about. She did not have a knife. She was not doing anything to Weaver to cause the shooting. On cross-examination the witness Williams stated that Mary Bell was drinking, but that she was not drunk. The witness stated that he did not see the pistol. On redirect, he said that he did see Weaver put his hands towards Mary Bell, heard the shot, and saw her double up.
George Wise testified: He first saw Mary Bell at Robert Walker's cafe. She got in the automobile at that place. Her husband, another girl, and Robert Williams were also in the car. They went to Philip Elder's cafe. When they drove up in front of Elder's, Richard Weaver was standing on the opposite corner from the cafe. Robert Williams, Mary Bell, and her husband got out of the car, leaving the witness Wise in the automobile. Williams was standing there talking to Weaver. Mary Bell and her husband started towards the cafe. He did not see them stop where Weaver and Williams were talking. When the pistol shot, there were two cars between the witness and Weaver, but the witness could see them. He could see Mary Bell and she was standing out in the street. He did not see her do anything to Weaver. *Page 600 
He did not see her with a knife. She had her hands down at her side. When the shooting occurred, the witness was still in the automobile. He did not see her advance on Weaver. On cross-examination, the witness Wise testified: When Weaver shot Mary Bell, she and her husband were together locked by the arms and stopped. The witness did not see her threaten Weaver. If either Weaver or Mary Bell spoke a word there before or after the shooting, the witness did not hear it. On redirect, the witness stated that he did not see her with any knife that day.
Sanders Freeman testified: That he owned Philip Elder's cafe and the house next to it. On the Sunday afternoon that Mary Bell was shot, he was there. It happened late in the afternoon, between six and seven o'clock. The witness was feeding his stock when the car drove up. He saw the five persons in the car. Richard Weaver was standing there in front of the cafe. When Weaver and Robert Williams were standing there talking, Mary Bell got out of the car and passed by Williams, and the next thing the witness saw was that she got shot by Weaver. Mary Bell had passed Weaver and Williams and started back. She backed towards the car of the witness, and she had a smile on her face when Weaver pulled a pistol from behind him and shot. Weaver then threw his pistol on Mary Bell's husband and Bell ran behind the car and said, "I ain't done nothing to you, Rich." Mary Bell did not have any knife or razor or any kind of a weapon. She did not advance on Weaver. She was backing away with a smile on her face. On cross-examination, the witness said that he did not hear her say, "I am going to get my God damned blade."
Philip Elder testified: That he operated a cafe on Waddell Street. On the afternoon Mary Bell was shot he and Sanders Freeman were standing out in the street. He saw the automobile drive up with four or five negroes in it. The witness had seen Richard Weaver, who had been talking with them before the car drove up. Robert Williams got out of the car and called Weaver, and they began talking. They were about fifteen feet away. The witness Elder heard Weaver say, "Get back," and then Weaver "hauled off and shot her." Mary Bell was not advancing on Weaver. She had not said anything, only smiled. He did not see a knife when he helped to put her in the car after she was shot.
Dr. J. C. Holliday testified: That he was a practicing physician *Page 601 
in Athens and had been there a long time. He saw Mary Bell at the hospital immediately after she was shot. It was a bullet wound about two inches to the left of the umbilicus, the navel. She was in quite a lot of shock. Upon opening her the intestines were found to be punctured in five places and at one place almost severed. She had four wounds in the misentery. The bullet ranged downward from the level of the umbilicus and lodged inside the left pelvis. The bullet was not removed. It looked in the X-ray like a thirty-two-caliber pistol bullet. She was in the hospital a month and five days. Her condition was critical until about a week before she went home. She got better and he agreed to let her go home and let the nurse go by there and dress it. The nurse reported that the wound had healed. On Thursday before Mary Bell died, her mother came down and said Mary had a cold. He prescribed for the cold and did not hear any more until he was called the afternoon she died. At first he could not go because of being tied up on another case, but later he did go. When he reached the hospital where Mary Bell had been sent, she was breathing her last. Her pulse was very weak and she was in a cold perspiration. He stated: "As to what she died of right at that time, from the history that I got, I am satisfied she died from a thrombus, as we considered pneumonia would not have killed her that quickly. My opinion is that it was a thrombus. A thrombus is something that comes from several different things. A thrombus usually follows a traumatic injury, which would be in the form of a blood clot that would form in the small vessel and push up and swell up a little larger and finally when it hit the lung or heart it is too large and kills. It is a blood clot. As to whether a blood clot is somewhat usual and sometimes develops from an operation or wounds, sometimes it will develop from the smallest operation, even from an appendectomy. I would say, in my opinion, most likely the gunshot wound was the cause of her death. As to whether I would say it was the proximate cause of her death, I do not know any other reason. She was a well-made negro woman and well-nourished. She was a strong negress before the injury, no doubt. It is my testimony that in my opinion her death was caused by a gunshot wound." On cross-examination, Dr. Holliday testified: "When she left the hospital, I thought she was getting along fine. . . When I did see her on the 14th *Page 602 
of September she was suffering from a thrombus and the woman was practically dead. An autopsy would have settled that question. I could not tell the jury the cause of her death without an autopsy. I told the nurse to see whether they would have an autopsy, and she said that they did not seem to want to do it. I even advised the sheriff of this county and told him she had died. Without an autopsy I can not be positive in my testimony as to what caused it; we have symptoms though. It is possible for people who have never been shot to have a thrombus. People who are shot and get well sometimes have a thrombus. . . After all, we are certain she died from a thrombus. I am satisfied she had a thrombus, but I am not sure where it came from. She could have had it if she had never been shot." On redirect, Dr. Holliday stated: "In that death certificate I stated the cause of her death to be a thrombus, and I put `gunshot wound' as the real factor. I put thrombus following gunshot wound, and that is not to say that the gunshot wound or pistol caused that. I can not tell the jury the gunshot wound or pistol caused that. There is no way to tell it, and if we had made an autopsy in the heart or brain, we would not know exactly where it came from. She gave her age in the hospital as being twenty-three years old and she also gave me her age as twenty-three."
Grant Bell, the husband of the deceased, testified for the State: That Mary Bell did not say anything about any blade. She had nothing in her hands. She did not even open her mouth.
Testimony for the defendant, Richard Weaver, was, in substance as follows. Scott Bolton testified: That he was sitting in front of the cafe when the automobile drove up. A woman that he did not know got out of the car and said, "Let me get my God damned blade." She did not say that before she got out of the car. The next thing the witness heard was somebody else saying, "Get back", and then a pistol fired. Those things followed each other pretty quickly. On cross-examination, the witness, Bolton said: That he and Richard Weaver were pretty good friends. The witness did not know whether Mary Bell was the one who said "Let me get my God damned blade." She did not have a pocket knife or any weapon whatever so far as he could see.
Scott McCleskey testified: That he was at Philip Elder's cafe the afternoon of the shooting. The girl who got shot got out of *Page 603 
the car and said, "Let me get my God damned blade out." Then she went towards the cafe. It was about four or five minutes after she made that statement until the shot was fired.
Emory Griffin testified: That he saw Richard Weaver a week before the shooting took place. At that time he saw Mary Bell at the bus station, and Weaver was coming across Broad Street. She said to Weaver, "You had better go across, if I get close to you, I will cut your so and so off."
Jim Day Weaver testified: That he was Richard Weaver's son. He knew Mary Bell, and they lived in the same neighborhood.
Richard Weaver, the accused, made a statement, in substance, as follows: That this thing first started when Mary Bell cut his son so badly that the latter had to be taken to a hospital. A few days later the accused saw her at the bus station. She said — I made a case against her — and she said, "You won't make another." He went to the ball game the Sunday it actually happened and came back by Philip Elder's cafe. He was feeling bad and sick. He went to Sanders Freeman to ask him to take him home. Then the automobile drove up. Robert Williams got out and called him. Mary Bell got out of the car. Williams called and Mary Bell turned and started back. The accused said to her, "Don't come on me." He then stated, "I got excited and scared, as I saw how bad she had cut my boy, and I was afraid of her. I didn't mean to shoot her, but I was scared of her, and I told her to get back, and she continued to come on me, and it looked like I got blind and just shot."
1. When a son of the defendant was on the stand as a witness, the trial judge refused to permit the son to answer a question as to whether on another occasion the deceased had cut the son. The defendant contends that, if the witness had been permitted to respond to the question, he would have answered that the deceased cut him, and that the reputation of the deceased for violence was bad. Further, in the same special ground, it is contended that *Page 604 
the evidence showed that the deceased was the aggressor and had brought the fight to the defendant. The defendant contends in his brief that the failure to admit this evidence was harmful, for the reason that it would have established the fears of a reasonable man at the time and place of the shooting.
After an examination of the evidence and the statement of the defendant in the trial court, we do not find anything that would lead us to the conclusion that the deceased was the aggressor. One of the witnesses for the defendant claimed to have heard Mary Bell (the person shot) say as she was leaving the automobile, "Let me get my God damned blade;" and another witness for the defendant testified that she said, "Let me get my God damned blade out." If it be assumed that the testimony of these witnesses was correct, the statement actually made by Mary Bell was not, under the circumstances, any indication of aggression on her part, especially where her words were not coupled with any affirmative act of aggression, but the words may have been consistent with the idea of defensive precaution. Neither the defendant nor his witnesses saw Mary Bell with a knife at the time she was shot. No knife was found. There was positive testimony that she did not have a knife. An eyewitness testified that she was backing towards the automobile in which she had come to the cafe, with a smile on her face, when Richard Weaver pulled a pistol from behind him and shot her. Substantially the same was testified by several other witnesses, all negativing any idea of aggression on her part.
In support of his contention that the testimony was admissible, the defendant cites, and relies on Rawlins v.State, 124 Ga. 31, 45 (11) (52 S.E. 1), which reads as follows: "Evidence was admitted tending to show that there was a state of bad feeling between the Carter family and the Rawlins family, and especially between the heads of the two families. This evidence was objected to on the ground that the evidence of bad feeling should be limited to any bad feeling that might exist between Milton Rawlins and the children that were killed. There was no merit to this objection. The state of feeling existing between the father of the accused and the father of the deceased was pertinent, and especially was it pertinent to show a state of bad feeling generally between the two families. The weight, of course, to be given to this testimony *Page 605 
was to be determined by the jury in ascertaining whether there was a motive for the accused on trial to commit the crime with which he was charged." We do not think that the authority cited is applicable to the present question.
One of the objections to the testimony, made at the trial, was that the character of the deceased could not be attacked by proof of specific acts and without showing that she was the aggressor. A defendant cannot by his own witness on direct examination show a general character for violence on the part of the deceased by proof of specific acts. Warrick v. State, 125 Ga. 133 (6) (53 S.E. 1027); Vernon v. State, 146 Ga. 709
(92 S.E. 76); Hamby v. State, 71 Ga. App. 817 (32 S.E.2d 546). There being no evidence that the deceased was the aggressor, it was not error for the trial court to reject the testimony offered by the defendant's witness which might have tended to show the general character for violence, because "proof of the violent and turbulent character of the deceased is admissible only when it is shown prima facie that the deceased was the assailant, that the accused had been assailed, and that the defendant . . was honestly seeking to defend himself." Crawley v. State,137 Ga. 777 (74 S.E. 537); Hamby v. State, supra; Hanye v.State, 99 Ga. 212 (25 S.E. 307); Gardner v. State,90 Ga. 310 (17 S.E. 86, 35 Am. St. R. 202); Drake v. State,75 Ga. 413; Doyal v. State, 70 Ga. 134 (5a). The same rule is applicable, even though the defendant may in a statement at the trial undertake to lay the foundation for such evidence by claiming that the deceased was the aggressor. Chapman v.State, 155 Ga. 393 (117 S.E. 321); Jones v. State,154 Ga. 423 (114 S.E. 326). Accordingly, the matters complained of in the first special ground are without merit.
2. The defendant contends that the evidence does not make out a case of murder, because the testimony of the physician is to the effect that the deceased had been considered on her way to recovery so far as the gunshot was concerned, and that her death was due to another and independent cause. Apparently there is no question as to the severity of the gunshot wound. The intestines were found to be punctured in five places and at one place almost severed. She had four wounds in the misentery. The bullet ranged downward from the level of the umbilicus and lodged inside the left pelvis, but the bullet was not removed. It is not *Page 606 
disputed that her condition was critical until about a week before she went home. She was shot on July 22 and died on September 14. After being in the hospital one month and five days and seemingly on her road to recovery, she was permitted to go home, where her wound was dressed by a nurse. On the day before she died the physician was notified that she had a cold and he prescribed for it without seeing her. The next afternoon the physician saw her in the hospital just before she died. Her pulse was very weak and she was in a cold perspiration. The gist of the defendant's contention in this special ground seems to be based on the portion of the testimony of the attending physician elicited on cross-examination, as follows: "When she left the hospital, I thought she was getting along fine. . . When I did see her on the 14th of September, she was suffering from a thrombus and the woman was practically dead. An autopsy would have settled that question. I could not tell the jury the cause of her death without an autopsy. I told the nurse to see whether they would have an autopsy, and she said that they did not seem to want to do it. I even advised the sheriff of this county and told him she had died. Without an autopsy I can not be positive in my testimony as to what caused it; we have symptoms though. It is possible for people who have never been shot to have a thrombus. I am satisfied she had a thrombus, but I am not sure where it came from." Whatever uncertainty, if any, this testimony of the physician might have when standing alone, is explained satisfactorily when considered together with his direct and redirect testimony, which was as follows: "As to what she died of right at that time, from the history that I got, I am satisfied she died from a thrombus, as we considered pneumonia would not have killed her that quickly. My opinion is that it was a thrombus. A thrombus usually follows a traumatic injury, which would be in the form of a blood clot that would form in the small vessel and push up and swell up a little larger, and finally when it hit the lung or heart it is too large and kills. It is a blood clot. As to whether a blood clot is somewhat usual and sometimes develops from an operation or wounds, sometimes it will develop from the smallest operation. I would say, in my opinion, most likely the gunshot wound was the cause of her death. As to whether I would say it was the proximate cause of her death, I do not know of any other *Page 607 
reason. She was a well-made negro woman and well nourished. She was a strong negress before the injury, no doubt. It is my testimony that in my opinion her death was caused by a gunshot wound. In that death certificate I stated the cause of her death to be a thrombus, and I put `gunshot wound' as the real factor. I put thrombus following gunshot wound, and that is not to say that the gunshot wound or pistol caused that. There is no way to tell it, and if we had made an autopsy in the heart or brain, we would not know exactly where it came from. She gave her age in the hospital as being twenty-three years old and she also gave me her age as twenty-three."
There is no suggestion of negligence or unskilled treatment of the gunshot wound, but if the deceased had failed to receive skilled treatment of the wound which was the primary cause that produced other and secondary causes from which the death resulted, the accused would not be relieved of the responsibility for the death of the deceased. Downing v. State, 114 Ga. 30
(2) (39 S.E. 927); Bonner v. State, 125 Ga. 237 (1, 2) (54 S.E. 143). In Long v. State, 60 Ga. App. 517 (4 S.E.2d 75), in the majority opinion of two of the three judges of a division, it was held: "Where the defendant shot the deceased with a pistol, inflicting a wound in his body fifteen inches long, and the bullet passed through his lung and was resting on a vertebra in the lower part of the deceased's spine at the time of his death about a month after he was shot, and where the defendant immediately after he was shot was taken to the hospital where he was treated for about three weeks and was then discharged from the hospital and went home, lived for about a week, and then died suddenly, there was a sufficient basis for the conclusion that death resulted from the wound rather than from some other cause, the existence of which there was no evidence to establish." The Long case, supra, was on its facts weaker than the present case as to medical opinion of what caused the death, because in the Long case the doctors failed to give their professional opinion of what caused the death, stating only that syphilis did not cause it, but in the present case the gunshot was given as the proximate cause. See also Brown v.State, 10 Ga. App. 216 (73 S.E. 33); Wells v. State,46 Ga. App. 412 (167 S.E. 709), and citations; McLain v.State, 71 Ga. 279; Brundage v. State, 70 Ga. App. 696
(29 S.E.2d 316), and citations; *Page 608 Wilson v. State, 190 Ga. 824 (10 S.E.2d 861). In theWilson case, supra, the deceased lived from January 31 until October 4, and the immediate cause of her death was an infected lung. However, the physician testified that the primary cause of her trouble was the wound on her head, and that the infection was secondary, resulting from low resistance caused by the injury and shock resulting therefrom. In that case, this court held that the evidence was sufficient to authorize the verdict. The evidence in this case authorized the jury to find that the deceased was shot with a pistol by the accused, and the facts with reference to the nature of the wound inflicted upon the deceased were before the jury. The only other illness shown was that the deceased had contracted a cold, and the doctor testified definitely that in his opinion that illness was not the cause of her death. From the testimony with respect to the age and physical strength of the deceased, the nature of the injury, and the circumstances surrounding her death, the jury was clearly authorized to find beyond a reasonable doubt that death resulted from the wound inflicted by the accused and not from any independent cause. Therefore special ground 2 is without merit.
3. There was ample evidence to authorize the verdict and it was not erroneous to overrule the general grounds of the motion for new trial.
Judgment affirmed. All the Justices concur.