The evidence was not conflicting as to the fact that the immediate cause of the death of the deceased was a pulmonary embolism; however, the medical testimony clearly left the question with the jury to decide whether the pulmonary embolism was wholly disassociated from the occurrence of May 5, 1947, or was caused by the injuries inflicted on the deceased on that day by the defendant.
In finding the defendant guilty of voluntary manslaughter, the jury must have found that the origin of the pulmonary embolism was the beating and "stomping" which the deceased received at the hands of the defendant on May 5th, and we can not say that they erred in reaching this conclusion.
 DECIDED MAY 21, 1948.
The defendant, Clifford Heath, was tried for murder and was found guilty of voluntary manslaughter. He made his motion for a new trial, which was overruled, and he excepted. His only contention here is that the jury were not authorized to find that the wounds inflicted upon the deceased, Andrew Jackson Turner, by himself, as defendant, were the cause of the deceased's death — that the jury were not able to say that the circumstances relied upon supported this hypothesis to the exclusion of every other reasonable hypothesis. He contends that nowhere in the record is there any evidence or testimony, by the expert witnesses or otherwise, that the wounds received by A. J. Turner were such wounds as would likely and usually result in death — that neither of the two doctors who testified in the case said that in their opinion the death resulted from the wounds received on May 5, 1947, the date alleged in the indictment. *Page 128 
Dr. C. J. Sapp, sworn for the State, testified as follows: "I did have occasion to see one Andrew Jackson Turner on or about the 5th day of May of this year [1947]. When I saw him he looked like he had been in some sort of a fight or brawl in which he had sustained multiple contusions and lacerations about his face and body; also multiple fractures of his ribs. He had fractures on both sides, according to the x-ray. Those on the left were the most recent ones. . . He was rather seriously injured. . . I didn't see anything [on his body] that I would say would directly cause a blood clot. A bruise can injure the blood vessels and thereby cause a blood clot. He had bruises all over his body — that would indicate that the underlying vessels would be injured. . . That is all I can state. . . A blood clot could have been present when I saw him and I still couldn't have had any clinical evidence of a blood clot being there. This was the first time that I had ever seen him. . . He left the hospital. He went to his home in Calhoun. Whether or not he went to another hospital or not I have no definite knowledge. He was not completely cured or healed up from his wounds when he left. He left against my advice at the insistence of his family that he be moved home. . . The primary cause of an embolism is stagnation of blood in the major vessels of the leg where they propagate an embolism or form into a clot. That is the ordinary cause of an embolism, such as a pulmonary embolism. They frequently occur in any person who is placed in bed. An injury would be more likely to cause it because of the damage to the line of the vessels giving a focus for the embolism to start, unless the injuries were in the leg. The most common cause of that formation in the leg is when a person is placed in bed. I did see him every day while he was in the hospital. I did not see any evidence of the formation of any such blood clot. A blood clot in an old person fifty to sixty years of age is sometimes likely to form and remain for several weeks before they break loose and move on. Such a clot could not have formed in February of this year and not have dislodged itself until May. They can form in a matter of two days up to three weeks. If they don't form immediately after the injury is received, there is less likelihood of their forming because of the injury." *Page 129 
When the deceased went to Calhoun, Georgia, he was treated by Dr. W. D. Hall, who testified: "I did have occasion to see Andrew Jackson Turner professionally during the month of May . . of this year. . . It was about the middle of May. He later died. When he was first seen by me he was badly beaten about the face and head — was all black and blue over his head and shoulders and his ribs were strapped . . as if he had fractured ribs and the patient apparently had lost a good bit of blood and was in a state of shock when seen by me. Later, Mr. Turner had what in my opinion was a pulmonary embolism, which is a blood clot that breaks off from some other part of the body and goes to the lungs, thereby stopping up an important vessel and [he] died as the result of that. Blood clots are usually brought on by injury or following an operation. One could be caused by a person having been hit or kicked or beat with some instrument. After a blood clot of that kind is formed, it can usually be absorbed, of course, depending on the size, but from a few days to three or four weeks. This was not the first visit that I had ever had from Mr. Turner; I had seen him in February of 1947. At that time he had fallen from a scaffold and had broken three ribs and had a broken arm. . . If a blood clot had formed at that time I think it would have disappeared. . . Mr. Turner did some work for me after that — he painted the hospital for me . . in April. I have seen pulmonary embolism just as frequently in young people as in old people. The clot will usually be dislodged in three to four weeks . . after they actually develop. It might be possible that they would exist longer than three or four weeks but I have never seen that. . . He [A. J. Turner] was brought to my hospital on the 17th day of May in an ambulance. I made no x-rays at all. The only thing that I know about it, except what I could observe, was the case history given to me by him. The only examination of his head I made was just feeling of his head. There were no broken bones about his head that I could tell by feeling. I would consider his most serious injury in the rib area. . . He died . . in May of this year."
C. B. Turner Sr. testified in regard to the injuries received by his brother, the deceased, that: "Clifford [Heath, the defendant] *Page 130 
come up from the railroad tracks. . . Well, Mr. Hulsey [who was previously convicted for this offense], he knocked my son down and stomped him and come on up and jumped on my brother and my brother was laying down on his stomach . . and he commenced stomping him and then Mr. Heath [the defendant] went to stomping him on the other side and when they got through stomping him they come around; Hulsey walked around and kicked my eye out and Mr. Heath come up and squatted down in front of me and drew back his fist. . . He hit me one time is all. . . One was stomping on Andrew [the deceased] and one on the other side, stomping up and down his back. . . My brother was fifty-six and I will be sixty-six in December. . . I seen Mr. Hulsey hit my brother across the head with a bottle; that is my brother that is dead."
Mr. Horton, the Assistant Chief of Police of Rome, testified that on the next morning after the deceased was injured on May 5, 1947, he went over to the Floyd Hospital to see the deceased and his brother; and he proceeded further as follows: "They were both in the ward. I went in to see them and the one of them had an eye knocked out. They were both beat, you wouldn't recognize them if you hadn't known them at all, they were — didn't hardly look like humans. . . Both of them's . . eyes were closed. You couldn't tell very much about them. . . The nurse wouldn't let us talk to them — said they wasn't able to talk to anyone. One of them was unconscious — the one that died."
It is not incumbent upon the State to show that it was impossible for the deceased to have died from natural sickness, from spontaneous clogging of the arteries, or from the former injury which occurred over two months prior to the occurrence of the injuries here in question. If the State shows the jury to a moral and reasonable certainty and beyond a reasonable doubt that the injuries here in question caused the death, it is sufficient. Brundage v. State, 70 Ga. App. 696
(29 S.E.2d 316); Peters v. State, 67 Ga. 29; McLain v.State, 71 Ga. 279; Buckhanon v. State, 151 Ga. 827
(108 S.E. 209); Wrisper v. State, 193 Ga. 157, 161
(17 S.E.2d, 714); Weaver v. State, 200 Ga. 598 *Page 131 
(37 S.E.2d 802); Wells v. State, 46 Ga. App. 412
(167 S.E. 709); Hicks v. State, 66 Ga. App. 577 (2) (18 S.E.2d 637); People v. Holmes, 118 Cal. 444 (50 P. 675).
As to what in fact was the immediate cause of the death of the deceased — the pulmonary embolism — the evidence was not conflicting. Assuming that it can be said that the cause of the pulmonary embolism either was a spontaneous clogging of the arteries or was the former injury which happened a little more than two months before the injuries to the deceased on May 5, the jury was not bound to adopt the hypothesis of either of these causes. As to the first hypothesis above — a spontaneous clogging of the arteries — there was introduced no evidence which would tend to establish it; and as to the second — the former injury — the medical testimony, with the other circumstances, authorized the jury to find that the facts did not fit the hypothesis that it caused the death. The medical testimony clearly left the question with the jury to decide whether the pulmonary embolism was wholly disassociated from the occurrence of May 5, or was caused by the injuries inflicted upon the deceased by the defendant on that day. The jurors having found the origin of the pulmonary embolism to be the treatment received by the deceased at the hands of the defendant and his associates, we cannot say that they erred in reaching that conclusion; and the trial court did not err in overruling the motion for a new trial.
Judgment affirmed. Gardner and Townsend, JJ., concur.