### 33055. GLADNEY *v.* THE STATE.

DECIDED SEPTEMBER 19, 1950.

*Walter D. Sanders, Wyatt, Morgan & Sumner,* for plaintiff in error.

*Wright Lipford, Solicitor-General,* contra.

MacINTYRE, P. J. Leon Gladney was indicted for murder. Upon the trial of the case the jury returned a verdict finding the defendant guilty of voluntary manslaughter and fixed his punishment at not less than one year and not more than three years in the penitentiary. The defendant's motion for a new trial based upon the usual general grounds and one special ground was overruled and he excepted.

It appears from one phase of the evidence that, on August 13, 1949, the defendant, who was serving as marshal of the town of Centralhatchee in Heard County, Georgia, was on duty when, at about 8:30 at night Thomas Gladney came to town and parked his truck so that the body of the truck extended into the highway. The defendant went to Thomas Gladney and requested him to move the truck so that it would not extend into the highway. Thomas Gladney, according to the defendant's statement, remarked, "Hell, its seven feet from the middle of the road," to which the defendant replied, "It don't make any difference; I will have to make a case unless you move it." It appears from the evidence that Thomas Gladney moved his truck a bit farther out of the highway and went close by to a filling station operated by Charlie Hardin. The defendant returned to his automobile, a short distance away, parked near the center of the town, from which vantage point he customarily kept his vigil in performing his duties as marshal of the town. He got into his automobile and was sitting on the left-hand side, under the steering wheel, engaged in a conversation with J. Dorsey Ashley, one of the witnesses on the trial, who was seated on the right-hand side of the car, when Thomas Gladney came toward the defendant's car from the direction of Charlie Hardin's filling station, a distance of approximately 168 feet away. As he approached the defendant's car on the side occupied by Ashley, he inquired of the defendant, "Why don't you make that other fellow move his car? It is on the pavement as much as mine." According to the witness Ashley, who was in the defendant's car, the defendant replied, "Tom, I asked you in a nice way to move your truck," and the defendant immediately got out of his car and walked around the rear of his car to the side on which the deceased was, where the deceased struck the defendant a staggering blow, knocking him almost down. (Just how far the defendant had gone on the deceased's side of the car is, under the record, indefinite.) When the defendant regained his equilibrium, he was scuffling with Thomas Gladney. Ashley did not know whether the defendant struck Thomas Gladney or not, as the blow was struck at a point more to the rear of the defendant's car from where Ashley was sitting. It was at this point that the shooting occurred, and the undisputed

testimony was that five shots were fired. Following the encounter between the defendant and Thomas Gladney, Thomas Gladney started back toward Charlie Hardin's filling station, and calling to Mr. Hardin said, "That son-of-a-bitch shot me." The defendant went to the store of Mr. Cartwright, another of the witnesses on the trial, and requested him to call the sheriff. The witness Ashley testified unequivocally that, at the time Thomas Gladney struck the defendant, the defendant had "never raised his hand or done anything to Tom Gladney." It appears further that, suffering from the wounds inflicted during the encounter with the defendant, Thomas Gladney was taken to the hospital by the defendant, where he died that night.

Upon the arrival of the sheriff at the hospital, approximately 20 or 30 minutes after the shooting, the defendant turned his pistol over to the sheriff. The sheriff testified concerning the defendant's gun, "It was empty, empty cartridges in it." The evidence is undisputed that, at the time of the shooting, Thomas Gladney had a pistol, which was not concealed as it was stuck in a holster under his belt and was sticking out from under his shirt. This pistol was turned over to the sheriff on the night of the shooting, and though the gun passed through the hands of several persons before reaching the sheriff, the sheriff testified that there were no empty chambers in this pistol, at the time he received it. The defendant introduced M. P. Awbrey as a witness, and he testified that the defendant's car was a two-door car, and that he had removed the right-hand door of the car, the side on which the shooting occurred. The door, which was tendered in evidence, contained a hole. This witness testified that he saw the hole in the door the next morning, but there was no evidence of how the hole came to be there, or of when or by whom it was put there. The defendant made the following statement: ". . . The night this happened up there, the city had impressed it on me not to permit people to park in the road; Tom Gladney parked his car with a few feet of the body sticking up in the highway. I walked out and there and says, 'Hello Tom.' I says, 'Tom, move your truck back a few more feet.' He says, 'Hell, its seven feet from the middle of the road.' I says, 'It don't make any difference, I will have to make a case unless you move it.' I got back in the car and set down. He went

out to Hardin's and stayed out there a little bit. Mr. Hardin come out and a negro come up in front of Hardin's filling station. Tom came over where I was. I was in the car, sitting in there. Tom was standing near the back where the door is. I walked up there and he says, 'Why don't you make that God damn son-of-a-bitch move his car?' and he hit me and knocked me back with a hard lick. When I come to myself, Tom's gun was pointed right on me. I grabbed the gun and that is when the firing took place. Tom turned, and when I grabbed the gun and jerked loose from me and run back and he raised the gun again and turned and went back down there towards Hardin's. with the gun in his hand. I went to Mr. Cartwright's store and told him to call the sheriff, I hated to do it but had to. I don't know how many shots were fired. I couldn't tell you how many times I shot. I put Tom in the car and brought him to the hospital and took it out and there were four shells and two cartridges, making four times I shot. I picked Tom up and brought him to the hospital, with Mr. Hardin and Williams helped me; carried him to the hospital and I stayed there until the sheriff come. They called the sheriff. I asked him what to do, and he said stay right there. I had to do it. I done it in self-defense only."

■ The jury was authorized to find from the evidence and the defendant's statement to the jury that, under the circumstances at the time the defendant shot the deceased, there was. no actual or apparent necessity to slay to prevent the commission of a felony upon the defendant, but that the defendant,. under one phase of the evidence and the defendant's statement,. acting under an unabated heat of passion, aroused by an actual. assault less than a felony upon him by the deceased, shot and killed Thomas Gladney. It follows that the jury was authorized to find against the defense of justifiable homicide and in returning the verdict of voluntary manslaughter. *Albert* v. *State*, 70, *Ga. App.* 39 (27 S. E. 2d, 249); *Barney* v. *State*, 5 *Ga. App.* 301 (63 S. E. 28); *Walker* v. *State*, 80 *Ga. App.* 418, 421 (56 S. E.. 2d, 132); *Ragland* v. *State*, 111 *Ga.* 211, 214 (36 S. E. 682); *Brown* v. *State*, 144 *Ga.* 216, 218 (87 S. E. 4).

■ In special ground 1, the defendant contends that "the, prosecution failed to establish the fact of the proof of death,.

which said fact is necessary to conviction of the movant of the crime with which he is charged and convicted."

The testimony of one Norris Kee, is as follows: "I am employed by Lewis & Lipford, funeral directors, as an embalmer. I am a licensed embalmer. I knew Thomas Gladney, or Tom Gladney. I saw Tom Gladney on the 13th day of August, 1949, at the Heard County Memorial Hospital. He was dead. I examined his body. He had wounds on his body. He had one right here on the left arm (indicating); about two or three inches of the left elbow, outside of the left arm; one inside of the left arm; one on the left side; one in his right hand, went in this finger (indicating) on his right hand; one in the back below his shoulder blade; and one about half way between the Adam's apple and the middle of the neck. They were bullet wounds. I did not examine those wounds closely. I looked at where they went in on the body. In my opinion these bullet wounds produced his death. He had eight holes in him. I don't know how many times he was shot. It could be that one shot made two wounds. One was right here (indicating), on the outside of the elbow, and one inside of his arm. I did not make any probe of the wounds to see where the bullets went in and come out. There was a hole in his left arm below his elbow and one in the back of the arm. There was one in the left arm, one in his right hand close to his first finger; one right under here and one right here (indicating): There was one in his right hand near the index finger and thumb. There was another right here (indicating). I don't know, I reckon that was where the bullet come out. Two holes right together. I did not probe the wounds at all. There was one right in his back, below his left shoulder blade; one in his neck about half way between the Adam's apple and the root of the neck. I don't know where these bullets entered, I couldn't tell. There was a bullet that went into his left side. There was one right here (indicating). In reply to the question, 'Is it possible that either one of those bullets come out and went [in?] out at another place,' I don't know the position the deceased was in at the time the bullets struck him. I would say it is entirely possible that the bullet that went in here (indicating) was the same one that made this hole (indicating). It is entirely possible that the same bullet that went

through the left arm was the same one that went in his side. I don't know how many times he was shot. Some of the holes could have been made by the same bullet. There were eight holes in his body both going and coming. It could have been that he was shot four times, it is possible."

The other evidence authorized the finding that the defendant inflicted these wounds the same night the deceased was taken to the hospital and he died. Counsel for the defendant contend that there was no proof that Thomas Gladney died from bullet wounds rather than from a heart attack suffered because of the excitement on the night in question. We think that the evidence was a sufficient basis for the conclusion that death resulted from the wounds rather than from some other cause, the existence of which there was no evidence to establish. *Long* v. *State,* 60 *Ga. App.* 517 (4 S. E. 2d, 75); *Weaver* v. *State,* 200 *Ga.* 598, 607 (37 S. E. 2d, 802); *Hicks* v. *State,* 66 *Ga. App.* 577 (18 S. E. 2d, 637); *Pinson* v. *State,* 184 *Ga.* 333 (191 S. E. 95).

The court did not err in overruling the motion for a new trial.

*Judgment affirmed.  Gardner and Townsend, JJ., concur.*